**MENASHA CORPORATION Plaintiff,**

v.

**LUMBERMENS MUTUAL CASUALTY COMPANY and Great American Assurance Company Defendants.**

No. 03–C–0570.

United States District Court, E.D. Wisconsin.

March 18, 2005.

Erie VanVugt, Milwaukee, WI, Kent Withycombe, Washington, DC, Lars Gulbrandsen, Milwaukee, WI, for Plaintiff.

Todd Schenk, Chicago, IL, for Lumbermens.

Heidi Vogt, George Hall, Milwaukee, WI, for Great Am.

## DECISION AND ORDER

ADELMAN, District Judge.

In 2003, plaintiff Menasha Corporation filed this action against defendants Lumbermens Mutual Casualty Company ("LMC") and Great American Assurance Company ("GAA"), alleging that defen-

dants breached their duties to defend it in a lawsuit brought by Siemens VDO Automotive Corporation ("Siemens"). I have jurisdiction because the parties are diverse and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Before me now are the parties' cross-motions for summary judgment.

## I. BACKGROUND

In June 2002, Siemens sued plaintiff in federal court in Virginia alleging breach of contract and breach of warranty in connection with a product that plaintiff manufactured for it. Siemens alleged that in the early 1990's it contracted to supply the Chrysler Corporation ("Chrysler") with fuel rail assemblies, devices that deliver fuel from an automobile's fuel line to its fuel injectors. Because Chrysler required the devices' fuel rails [1] to be molded from thermoset plastic,[2] and Siemens could not supply rails of this type, Siemens contracted with plaintiff to provide them. Thus, plaintiff supplied Siemens with fuel rails, Siemens incorporated the rails into fuel rail assemblies, and Chrysler used the assemblies in its sedans. In 1998, an investigation revealed that the fuel rails in Chrysler vehicles could crack, and Chrysler agreed to recall over 650,000 vehicles. In September 2000, Chrysler charged Siemens $35,000,000 in recall-related costs. Believing that the fuel rails created the potential for cracking, Siemens asked plaintiff to indemnify it, and when plaintiff declined, Siemens commenced suit.

Plaintiff presented Siemens's complaint to defendants, and defendants concluded that it did not give rise to coverage under their policies. They therefore advised plaintiff that they would not defend the suit on its behalf. Plaintiff defended the claim, eventually settling for $7,500,000, and then commenced the present action.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, it is "not required to draw every conceivable inference from the record—only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991).

**1.** Siemens's fuel rail assembly contained two fuel rails, an inlet rail and an outlet rail. (*See* Bonham Aff. [R. 61] ¶ 3 & Ex. B, fig. 9.)

**2.** Generally, thermosets are polymeric materials which solidify or set irreversibly through a chemical reaction that may require heat and pressure. See *McGraw–Hill Dictionary of Sci-*

*entific and Technical Terms* 2137(6th ed.2003); Sidney H. Goodman, *Handbook of Thermoset Plastics* 1–3 (2d ed.1998). Thermosets may be contrasted with thermoplastics, which repeatedly soften when heated and harden when cooled. *McGraw–Hill Dictionary* at 2137.

When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.1983).

## III. DISCUSSION

Under a typical liability insurance policy, an insurer must indemnify its insured for, and defend its insured in any lawsuit alleging, liability covered by the policy. *See Elliott v. Donahue*, 169 Wis.2d 310, 320, 485 N.W.2d 403 (1992).[3] In the present case, plaintiff contends that defendants breached their respective duties to defend. However, I conclude that neither defendant was obliged to defend Siemens's suit against plaintiff and that, therefore, defendants' summary judgment motions must be granted.

### A. Applicable Legal Rules

■ Under Wisconsin law, an insurer has a duty to defend its insured in a lawsuit when the complaint alleges facts which, if proven, would create liability covered by the policy. *See, e.g., Doyle v. Engelke*, 219 Wis.2d 277, 284–85, 580 N.W.2d 245 (1998). In determining whether an insurer has a duty to defend,

the complaint must be liberally construed and all reasonable inferences drawn in favor of the insured. *Id.* at 284, 580 N.W.2d 245. Any doubt as to whether the complaint triggers an insurer's duty to defend must be resolved in favor of the insured. *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis.2d 235, 266, 593 N.W.2d 445 (1999). In other words, an insurer has a duty to defend its insured when the complaint at least "arguably" asserts liability covered by the policy. *Hamlin Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 94 (7th Cir.1996).[4] However, because complaints are not always accurate, one cannot be certain from reading one that it will not lead to the insured's being subject to liability covered by the insurance policy. *Id.* at 96. Yet, a complaint does not trigger an insurer's duty to defend unless there is a "plausible" interpretation of it that brings its allegations within the scope of the policy. *Id.* Thus, the question presented is whether under any plausible interpretation, Siemens's complaint alleged covered liability. Before addressing this question, however, I must discuss several preliminary arguments asserted by plaintiff.

### 1. Consideration of Extrinsic Evidence

■ Plaintiff first argues that in determining whether defendants had duties to

---

3. In a diversity case, I apply state law, here Wisconsin's, as I believe the highest court of the state would apply it. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 669 (7th Cir.2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

4. Some cases state that an insurer has a duty to defend when a complaint indicates that coverage is "fairly debatable." *See, e.g., Radke v. Fireman's Fund Ins. Co.*, 217 Wis.2d 39, 44, 577 N.W.2d 366 (1998); *United States Fire Ins. Co. v. Good Humor Corp.*, 173 Wis.2d 804, 820, 496 N.W.2d 730 (1993). In the

insurance law context, courts typically use the phrase "fairly debatable" in connection with the tort of insurance bad faith. Specifically, when an insurer denies a fairly debatable claim, it cannot be held liable for bad faith. *See, e.g., Mowry v. Badger State Mut. Cas. Co.*, 129 Wis.2d 496, 516, 385 N.W.2d 171 (1986). In contrast, in the duty to defend context, courts use "fairly debatable" as a synonym for "arguable," i.e., when asking whether a complaint "arguably" asserts liability covered by a policy. *See, e.g., Straz v. The Kansas Bankers Sur. Co.*, 986 F.Supp. 563, 569 (E.D.Wis.1997). To avoid confusion, I will use "arguable" instead of "fairly debatable."

defend, I may consult materials other than Siemens's complaint and the relevant insurance policies. However, in addressing whether an insurer has a duty to defend, a court may not go beyond the four corners of the complaint and the relevant insurance policy. *See Doyle,* 219 Wis.2d at 285 n. 3, 580 N.W.2d 245 (disapproving suggestion that courts may go beyond four corners of complaint and stating that suggestion was "contrary to a long line of cases in [Wisconsin] which indicate that courts are to make conclusions on coverage issues based solely on the allegations within the complaint"). In support of its argument, plaintiff cites two federal cases, *American Motorists Insurance Co. v. Trane Co.,* 544 F.Supp. 669 (W.D.Wis.1982), and *Pfeifer v. Sentry Insurance,* 745 F.Supp. 1434 (E.D.Wis.1990). However, a Wisconsin court has stated that insofar as it holds that a court may consider extrinsic evidence, *Trane* was wrongly decided, *see Prof'l Office Bldgs., Inc. v. Royal Indem. Co.,* 145 Wis.2d 573, 580–83, 427 N.W.2d 427 (1988), and *Pfeifer* simply cites *Trane* in dicta without acknowledging *Professional Office Buildings, Pfeifer,* 745 F.Supp. at 1439. Thus, in determining whether defendants were obliged to defend plaintiff, I will not consider extrinsic evidence.

### 2. Estoppel

██ Next, plaintiff argues that when an insured asks an insurer to defend a suit, the insurer must defend under a reservation of rights or seek to intervene in the suit and ask the court to determine whether there is coverage before any proceedings on liability occur, and that if the insurer does neither, it may not subsequently contest whether it had a duty to defend.[5] However, plaintiff's argument misstates Wisconsin law. Under Wisconsin law, when an insured asks an insurer to

defend a suit, the insurer is not obliged to do so unless it has a duty to defend and, as discussed, a duty to defend is only triggered by a complaint that plausibly alleges covered liability. *See, e.g., Hamlin, Inc.,* 86 F.3d at 96. Thus, plaintiff's assertion that "Wisconsin insurance law requires insurance companies to provide a defense if there is *any possibility,* however remote, that the claim against their policyholder may result in covered liability," (Pl.'s Mem. in Reply [R. 78] at 1 (emphasis in original)), is incorrect. Secondly, under Wisconsin law, when an insured asks an insurer to defend a suit and the insurer neither defends under a reservation of rights nor asks the court to determine coverage before liability, it breaches its duty to defend *only if a court ultimately determines that it had a duty to defend.* If the insurer had no duty to defend in the first place, it will suffer no adverse consequences. *See Midway Motor Lodge of Brookfield v. Hartford Ins. Group,* 226 Wis.2d 23, 37–38, 593 N.W.2d 852 (1999); *Prod. Stamping Corp. v. Maryland Cas. Co.,* 199 Wis.2d 322, 331 n. 4, 544 N.W.2d 584 (1996); Arnold P. Anderson, *Wisconsin Insurance Law* § 7.51 (5th ed.2004).

Plaintiff appears to misread Wisconsin cases indicating that when an insurer is uncertain as to whether it has a duty to defend, the "proper" procedure is to defend under a reservation of rights or seek a coverage determination prior to a liability determination. *See Newhouse v. Citizens Sec. Mut. Ins. Co.,* 176 Wis.2d 824, 833–37, 501 N.W.2d 1 (1993); *see also Elliott,* 169 Wis.2d at 318, 485 N.W.2d 403; *Mowry,* 129 Wis.2d at 527–30, 385 N.W.2d 171. These cases mean only that it is prudent for an insurer to follow the above procedure because if does not and a court eventually determines that it had a duty to

---

5. By "defend under a reservation of rights," plaintiff refers to the insurer's defending the suit but reserving its right to later contest coverage.

defend the suit, it will have breached the duty to defend and be liable "for all the damages that naturally flow from the breach." *Newhouse*, 176 Wis.2d at 835–39, 501 N.W.2d 1. They do not hold that an insurer will incur liability if it is found to have had no duty to defend.

Plaintiff may also misread cases indicating that when an insurer breaches its duty to defend, it may not subsequently contest "coverage." *See, e.g., Radke v. Fireman's Fund Ins. Co.*, 217 Wis.2d 39, 49, 577 N.W.2d 366 (1998); *Grube v. Daun*, 173 Wis.2d 30, 76, 496 N.W.2d 106 (1992); *Prof'l Office Bldgs.*, 145 Wis.2d at 584–86, 427 N.W.2d 427. Although in some contexts "coverage" may refer both to the duty to defend and the duty to indemnify, *see* Anderson, *supra*, § 7.75, in the cases cited above, "coverage" refers only to the duty to indemnify. *See also Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 221 Wis.2d 800, 814 n. 7, 586 N.W.2d 29 (1998), *aff'd*, 233 Wis.2d 314, 607 N.W.2d 276 (2000) (distinguishing between duty to defend and coverage); *Good Humor Corp.*, 173 Wis.2d at 820, 496 N.W.2d 730 (using "coverage" and "duty to indemnify" in successive paragraphs synonymously). Thus, the rule of *Professional Office Buildings* and its progeny is that when an insurer breaches its duty to defend, it may not later contest whether it must indemnify the insured for liability incurred in the lawsuit. However, this rule is irrelevant to whether the insurer had a duty to defend in the first place.

Thus, plaintiff's argument that defendants are estopped from denying that they had a duty to defend the Siemens suit fails.

### 3. Consideration of Policy Exclusions

Plaintiff also argues that in determining whether defendants had duties to defend, I may not consider exclusions in their policies. Plaintiff bases this argument on statements in two state court of appeals cases that, when determining whether a complaint triggers a duty to defend, a court must ignore "any exclusionary or limiting terms and conditions of the policies." *Radke*, 217 Wis.2d at 44, 577 N.W.2d 366; *Kenefick v. Hitchcock*, 187 Wis.2d 218, 232, 522 N.W.2d 261 (1994).[6] However, when addressing whether there is a duty to defend, Wisconsin courts frequently consider exclusions. *See, e.g., Peace ex rel. Lerner v. Northwestern Nat'l Ins. Co.*, 228 Wis.2d 106, 113–19, 596 N.W.2d 429 (1999); *Doyle*, 219 Wis.2d at 290, 580 N.W.2d 245; *Wis. Pub. Serv. Corp. v. Heritage Mut. Ins. Co.*, 209 Wis.2d 160, 162–63, 561 N.W.2d 726 (1997); *Last v. Am. Family Mut. Ins. Co.*, 238 Wis.2d 140, 146–47, 617 N.W.2d 215 (2000); *Bruner v. Heritage Companies*, 225 Wis.2d 728, 738–40, 593 N.W.2d 814 (1999); *Monfils v. Charles*, 216 Wis.2d 323, 331–35, 575 N.W.2d 728 (1998); *Prod. Stamping Corp.*, 199 Wis.2d at 330–31, 544 N.W.2d 584; *see also Hamlin, Inc.*, 86 F.3d at 95–96; *Carney v. Vill. of Darien*, 60 F.3d 1273, 1280–81 (7th Cir.1995); *Fernandez v. Strand*, 63 F.Supp.2d 949, 957 (E.D.Wis.1999); *Straz*, 986 F.Supp. at 569; Anderson, *supra*, § 7.22. Further, as discussed, the duty to defend extends only to claims arguably

---

6. Although the *Radke* court stated that it had to ignore policy exclusions, it did not actually do so. The complaint in the underlying lawsuit alleged claims for both intentional and negligent infliction of emotional distress. 217 Wis.2d at 47, 577 N.W.2d 366. The court held that the insurer had a duty to defend the

suit because although the intentional infliction of emotional distress claim fell within the intentional acts exclusion, the negligent infliction claim arguably did not. *Id.* Thus, the court did not ignore the policy exclusion but held that the complaint stated a claim for liability that did not fall within it.

covered by the insurance policy, *see, e.g.,* *Doyle,* 219 Wis.2d at 284–85, 580 N.W.2d 245, and if a suit asserts only a claim falling within an exclusion, it does not arguably assert liability covered by the policy. Thus, without considering policy exclusions, a court cannot determine whether an insurer has a duty to defend a lawsuit. Accordingly, despite the language in *Radke* and *Kenefick,* I will consider the exclusions in defendants' policies.

## B. Whether Siemens's Complaint Triggered Duty to Defend

■ As mentioned, the issue in this case is whether, under any plausible interpretation, Siemens's complaint alleged liability covered by defendants' policies. Defendants' policies covered "damages" for which plaintiff became liable "because of . . . property damage" caused by an "occurrence." (Palmer Aff. [R. 43] ¶ 4 & Ex. C; Vogt Aff. [R. 24] ¶ 3 & Ex. B.)[7] Plaintiff argues that the complaint arguably alleged: (1) property damage from "engine fires allegedly caused by leaking fuel rail assemblies"; (2) "property damage to the Siemens fuel rail assemblies due to the allegedly defective Thermotech fuel rail"; and (3) "property damage to Chrysler vehicles potentially caused during the removal and repair process."[8] (Pl.'s Mem. in Opp. [R. 42] at 14.) The first two categories include property damage caused by fuel rails that actually cracked and harmed

the vehicles in which they were installed, and the third category includes damage caused during the recall by mechanics attempting to prevent the fuel rails from cracking and prevent cracked rails from causing engine fires and other damage. However, as explained below, the complaint did not claim damage falling within the first two categories, and although it arguably claimed damage falling within the third category, defendants' policies did not cover such damage. Therefore, under no plausible interpretation did the complaint allege covered liability.

### 1. Property Damage Caused by Cracked Fuel Rails

Siemens's complaint requested relief in the form of "[c]ompensatory and consequential damages resulting from [plaintiff's] breaches of multiple warranties." (Vogt Aff. Ex. A at 18.) The damages consisted of "$35,000,000 in recall-related costs and expenses" and the "costs and expenses" consisted of "the labor and material necessary to remove the defective part supplied by [plaintiff], replace and/or reinforce the part, and reinstall it." (*See id.* ¶¶ 2, 35, 36, 41, 50, 52.) The complaint did not mention engine fires or state that cracks in the fuel rails damaged any parts of the fuel rail assemblies other than the rails themselves.[9] Thus, the complaint did not allege that plaintiff was liable for dam-

---

7. Unless otherwise indicated, citations to the Palmer Affidavit refer to the affidavit filed on April 23, 2004, and citations to the Vogt Affidavit refer to the affidavit filed on January 29, 2004.

8. Plaintiff does not argue that defendants' policies covered damage to its fuel rails, probably because the policies exclude coverage for damage to plaintiff's own products.

9. Plaintiff argues that Siemens's statement that "[u]pon information and belief, because the rails were prone to crack in the same

location, deficiencies in [plaintiff's] design and molding process were responsible for the potential cracking problem" (Vogt Aff. Ex. A ¶ 34) alleges that the fuel rail cracks damaged other parts of the fuel rail assemblies. However, I read the statement to allege only that the fuel rails manufactured by plaintiff were prone to crack in the same spot, causing Siemens to believe that a defect in plaintiff's molding process caused the cracking. The statement cannot be reasonably read to allege that the fuel rail cracks damaged parts of the fuel rail assemblies other than the fuel rails themselves.

ages resulting from engine fires or from leaking fuel rail assemblies. Rather, it asserted liability only for the costs of replacing or repairing defective rails. In short, Siemens sought to recover the cost of *preventing* future cracks in fuel rails, engine fires and property damage, not damages incurred by vehicle owners as a result of fuel rails that had already cracked. Indeed, Siemens could not have brought such a claim because it would have belonged to the owners of the vehicles containing the cracked rails. Thus, Siemens's complaint may not be plausibly interpreted to seek damages on account of property damage caused by cracked fuel rails.[10]

### 2. Property Damage Caused During Recall

Plaintiff argues that during the recall of the vehicles containing plaintiff's product, the mechanics who repaired and/or replaced the fuel rails routinely discarded various auto parts, such as "gaskets" and "O-rings," [11] and thus caused property damage within the meaning of defendants' policies for which Siemens sought to recover. (*See* Pl.'s Mem. in Supp. [R. 59] at 7–8.) However, even assuming that an occurrence within the meaning of defendants' policies caused such damage,[12] as explained below, the policies' recall exclusions excluded liability for such damage.[13]

Defendants' insurance policies contained exclusions for damages claimed as a result of a recall of plaintiff's products. Specifically, LMC's policies excluded coverage for:

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, in-

10. Although I have concluded that when determining whether the Siemens complaint triggered defendants' duties to defend, I may not consider extrinsic evidence, *see supra* Part III.A.1, I note that none of plaintiff's extrinsic evidence suggests that Siemens sought to recover for damage caused by engine fires or already cracked fuel rails. The extrinsic evidence suggests only that engine fires occurred and led to the investigation which ultimately triggered the recall of Chrysler vehicles, and that Siemens sought to recover the costs of the recall from plaintiff. (*See* Palmer Aff. Ex. D.)

Plaintiff also suggests that because the engine fires triggered the recall, the recall-related damages constituted damages incurred "because of" property damage. (Pl.'s Mem. in Reply [R. 78] at 16.) In other words, plaintiff argues that but for the engine fires—which were "occurrences" that caused "property damage"—Chrysler would not have initiated the recall and incurred the recall-related damages for which they charged Siemens and which Siemens, in turn, sought to recover from plaintiff. However, even accepting this broad interpretation of "because of," the recall-related damages would fall within the recall exclusions of defendants' policies, which are discussed *infra* Part III.B.2.

11. Although it makes no difference to the outcome of the present case, I note that the record suggests that the O-rings were discarded because they were defective. (*See* Bonham Aff. [R. 61] ¶ 3 & Ex. B at MEN–INS 029346; Palmer Aff. Ex. E.)

12. Plaintiff makes no effort to establish that the property damage caused by the mechanics' discarding of parts during the recall resulted from an occurrence. Further, the relevant policies essentially define an occurrence as an accident. Because the mechanics intentionally discarded the parts while making repairs (*see* Bonham Aff. [R. 61] ¶ 3 & Ex. B ¶¶ A–14, A–32, A–34, A–36, A–38, A–39, A–41), it does not appear that the damage to such parts resulted from an accident.

13. I will refer to these exclusions as "recall" exclusions, although I note that courts often refer to them as "sistership" exclusions because insurers began including them in their policies to exclude coverage for costs resulting from the grounding of all airplanes of the same type when one of the planes crashed and its "sister ships" were suspected of having a common defect. *See* 21 Eric Mills Holmes, *Holmes' Appleman on Insurance 2d* § 132.9[F] (2002).

spection, repair, replacement, adjustment, removal or disposal of:

1) 'your product'; [14]

2) 'your work'; [15] or

3) 'impaired property' [16];

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Palmer Aff. Ex. C.) GAA's most recent policy contained a recall exclusion identical to LMC's; however, the recall exclusion in GAA's older policies contained slightly different language. The older policies excluded coverage for:

damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

(Vogt Aff. Ex. B.) Because plaintiff makes no argument based on the varying language of the recall exclusions, I assume that they are identical in all relevant respects.[17]

---

14. LMC's policies defined "your product" as any goods or products other than real property "manufactured, sold, handled, distributed or disposed of" by the insured. (Palmer Aff. Ex. C.)

15. LMC's policies defined "your work" as "[w]ork or operations performed by you or on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations." (Palmer Aff. Ex. C.)

16. LMC's policies defined "impaired property" as:

tangible property, other than 'your product' or 'your work,' that cannot be used or is less useful because:
a. It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
b. You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:
a. The repair, replacement, adjustment or removal of 'your product' or 'your work'; or
b. Your fulfilling the terms of the contract or agreement.
(Palmer Aff. Ex. C.)

17. However, I note that the older version of GAA's recall exclusion is identical to a recall exclusion that one state court of appeals has interpreted as excluding liability for damages claimed as part of a recall only if the insured initiated the recall. *See Good Humor Corp.,* 173 Wis.2d at 825–27, 496 N.W.2d 730. Because Chrysler, not plaintiff, initiated the recall of the Chrysler vehicles, if I followed *Good Humor,* I could not find that the recall-related damages fall within the recall exclusion in GAA's older policies. However, plaintiff has not raised this argument and I therefore consider it waived. *See United States v. Holm,* 326 F.3d 872, 877 (7th Cir.2003) (stating that "[i]t is not the obligation of [courts] to research and construct the legal arguments open to parties, especially when they are represented by counsel."). In any case, the Wisconsin Supreme Court has not decided whether the older recall exclusion applies to recalls not initiated by the insured, and as *Good Humor* recognizes, courts are split on this issue. 173 Wis.2d at 825, 496 N.W.2d 730. Further, "because the majority and better-reasoned view [of this exclusion] is that there is nothing in [the language of such exclusion] limiting its application to situations where the insured withdraws the product," 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 7.02[c][5] (12th ed.2004), I conclude that the Wisconsin Supreme Court would not follow *Good Humor, see, e.g., McGeshick v. Choucair,* 9 F.3d 1229, 1232 (7th Cir.1993) (stating that although federal court sitting in diversity must consider holdings of intermediate state appellate courts, they are not bound to follow such holdings if they have "good reasons" for diverging from them).

The cost of the gaskets, O-rings and other auto parts which Chrysler's mechanics routinely discarded during the recall process were costs incurred for the "withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of … 'your product'" (i.e., plaintiff's fuel rails), and such fuel rails were "withdrawn from the market or from use by [Chrysler] because of a known or suspected defect, deficiency, inadequacy or dangerous condition in" them (i.e., suspicion that they were likely to crack). Thus, even though Siemens's complaint may have asserted liability for "property damage to Chrysler vehicles potentially caused during the removal and repair process" (Pl.'s Mem. in Opp. [R. 42] at 14), defendants' policies did not cover such liability.

## IV. CONCLUSION

Because plaintiff has not suggested a plausible interpretation of Siemens's complaint under which plaintiff could incur liability covered by defendants' policies, defendants were not obliged to defend Siemens's suit.

**THEREFORE, IT IS ORDERED** that plaintiff's motion for summary judgment is **DENIED** and that defendants' motions for summary judgment are **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court shall enter judgment accordingly.