# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2756 |
| COMPLETE TITLE: | David M. Marks, |
| |         Plaintiff-Appellant-Cross-Respondent-Petitioner, |
| |         v. |
| | Houston Casualty Company, |
| |         Defendant-Respondent-Cross-Appellant, |
| | Bedford Underwriters, Ltd., |
| |         Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 363 Wis. 2d 505, 866 N.W.2d 393)
(Ct. App. 2015 – Published)
PDC No: 2015 WI App 44

| | |
|---|---|
| OPINION FILED: | June 30, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 16, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Richard J. Sankovitz |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | BRADLEY, A. W., J. and ABRAHAMSON, J. concur (Opinion filed). |
| | BRADLEY, R. G., J. concurs (Opinion filed). |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-cross-respondent-petitioner, there were briefs by *Jon E. Fredrickson*, *Brian T. Fahl*, *Aaron H. Aizenberg*, *Stuart J. Check*, and *Kravit, Hovel & Krawczyk, S.C.*, Milwaukee, and oral argument by Jon E. Fredrickson.



For the defendant-respondent-cross-appellant, there was a brief by *John D. Finerty*, *Adam E. Witkov*, and *Michael Best & Friedrich LLP*, Milwaukee and *Aidan M. McCormack*, *Robert C.*

*Santoro*, and *DLA Piper LLC (US)*, New York.  Oral argument by *Aidan M. McCormack*.

There was an amicus curiae brief by *James A. Friedman*, *Todd G. Smith*, *Linda S. Schmidt*, and *Godfrey & Kahn, S.C.*, Madison on behalf of Wisconsin Insurance Alliance and American Insurance Association.  Oral argument by *James A. Friedman.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP2756
(L.C. No. 2009CV18145)

STATE OF WISCONSIN      :      IN SUPREME COURT

**David M. Marks,**

      **Plaintiff-Appellant-Cross-Respondent-Petitioner,**

    **v.**

**Houston Casualty Company,**

      **Defendant-Respondent-Cross-Appellant,**

**Bedford Underwriters, Ltd.,**

      **Defendant-Respondent.**

**FILED**

**JUN 30, 2016**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals, <u>Marks v. Houston Casualty Co.</u>, 2015 WI App 44, 363 Wis. 2d 505, 866 N.W.2d 393, which affirmed the Milwaukee County circuit court's[1] grant of

---

[1] The Honorable Richard J. Sankovitz presided.

summary judgment in favor of Houston Casualty Company ("Houston Casualty") and Bedford Underwriters, Ltd.[2]

¶2 In July of 2009, trustee David Marks ("Marks") asked his professional liability insurer, Houston Casualty, to defend him in six lawsuits filed in 2007, 2008, and 2009 in five different states. Houston Casualty informed Marks that it had no duty to defend him in any of those lawsuits, and Marks then brought suit against Houston Casualty. Both the circuit court and the court of appeals agreed with Houston Casualty that a comparison of Marks' policy to the allegations in the complaints against Marks established that Houston Casualty had no duty to defend Marks.

¶3 We conclude that the complaints and counterclaim against Marks do not allege facts which, if proven, would constitute claims covered under the insurance policy Marks obtained from Houston Casualty. Houston Casualty therefore did not breach its duty to defend Marks when it declined to defend him in the six lawsuits at issue. Consequently, we affirm the decision of the court of appeals.

I. FACTUAL AND PROCEDURAL BACKGROUND

¶4 David Marks is the trustee of two trusts: the Irrevocable Children's Trust ("ICT") and the Irrevocable

---

[2] Although involved in these proceedings, Bedford Underwriters did not file a separate brief in this case and instead joins the positions taken by Houston Casualty. For simplicity, Bedford Underwriters will generally not be mentioned in this opinion.

Children's Trust No. 2 ("ICT2"). At all times relevant to this dispute, ICT and ICT2 owned a controlling interest in a company known as Titan Global Holdings, Inc. ("Titan").[3] From 2007 to 2009, a number of lawsuits involving Marks and Titan were filed throughout the country. Because the outcome of this case turns on the allegations contained in the five complaints and one set of counterclaims filed against Marks, we will set forth the contents of these documents in some detail.

¶5 On or about December 21, 2007, Oblio Telecom, Inc. ("Oblio") filed a lawsuit against Hawaii Global Exchange, Inc. ("Hawaii Global") in the United States District Court for the Northern District of Texas (the "Hawaii Global action").[4] On April 7, 2008, Hawaii Global filed a counterclaim against Oblio, Titan, Frank Crivello ("Crivello"), Marks, Bryan Chance ("Chance"), and Kurt Jensen ("Jensen"). The counterclaim described Marks as a "citizen of the State of Wisconsin" and "a principal shareholder and equitable owner of Titan" and asserted one count of conspiracy to commit fraud against the counterclaim

---

[3] One of the complaints filed against Titan (discussed infra) describes Titan as a "high-growth diversified holding company with a dynamic portfolio of companies engaged in emerging telecommunications markets and advanced technologies." A holding company is a "company formed to control other companies, usu. confining its role to owning stock and supervising management." Holding company, Black's Law Dictionary 339 (10th ed. 2014).

[4] Houston Casualty supplied this date, which is not in the record. Marks does not dispute the fact and it is not relevant to the disposition of this case.

3

defendants.[5]  On October 24, 2008, Hawaii Global filed amended counterclaims against Titan, Oblio, Marks, Chance, and Jensen.[6]

¶6  On October 28, 2008, the Professional Liability Errors & Omissions Insurance Policy at issue in this case ("the policy" or "Marks' policy"), issued by Houston Casualty to Marks, took effect.  The policy's expiration date was October 28, 2009.  The policy provided coverage for

> any Loss and Claim Expenses in excess of the Deductible amount and subject to the Limit of Liability as the Insured acting in the profession described in Item 3 of the Declarations shall become legally obligated to pay for Claim or Claims first made against the Insured during the Policy Period by reason of any Wrongful Act by an Insured provided always that the Insured has no knowledge of such Wrongful Act prior to the Inception Date of this

---

[5] The allegations in this lawsuit concern a business relationship between Hawaii Global and the counterclaim defendants apparently gone sour.  According to the complaint, Hawaii Global purchased prepaid phone cards from Oblio and Titan and sold them to distributors, retailers, and individual users.  Hawaii Global alleges that the counterclaim defendants conspired to defraud Hawaii Global, among others, by "inducing and extorting" them to purchase phone cards with "no intention to deliver the promised service."  Further, the counterclaim defendants allegedly

> conspired to use Titan and Oblio and other corporate shells to perpetrate a fraud upon Oblio's former distributors, including [Hawaii Global], with the intention of bankrupting them and eliminating them from the marketplace so that it could usurp their business for the benefit of a newly formed entity, Planet Direct, Inc.

[6] These counterclaims are not in the record.  The parties do not argue that these claims affect our analysis, so we do not address them.

4

Policy and further provided that such Wrongful Act took place subsequent to the Retroactive Date set forth in Item 8 of the Declarations.

¶7 "Loss" is defined in the policy to mean, in part, "a monetary judgment, award or settlement for damages including an award by a court of reasonable attorney's fees and costs to a party making [a] Claim." "Claim" is defined in the policy to mean "a demand received by the Insured for compensation of damages, including the service of suit . . . against the Insured." "Claim Expenses" is defined in the policy to mean, in part:

(1) fees charged by an attorney designated by the Company and (2) all other fees, costs or expenses incurred in the investigation, adjustment, defense and appeal of a Claim if incurred by the Company or an attorney designated by the Company, or by the Insureds with the written consent of the Company.

"Wrongful Act" is defined in the policy to mean "any actual or alleged error or omission or breach of duty committed or alleged to have been committed or for failure to render such professional services as are customarily rendered in the profession of the Insured as stated in Item 3 of the Declarations."

¶8 "Item 3 of the Declarations" lists Marks' profession as follows: "[s]olely in the performance of services as the Trustee of the Irrevocable Children's Trust (ICT), and/or Irrevocable Children's Trust No. 2 (ICT2), for a fee." Relevant to this appeal, the policy contained the following exclusions:

This Policy does not apply either directly or indirectly to any Claim and Claim Expenses:

5

a) Based upon or arising out of any dishonest, criminal, fraudulent, malicious or intentional Wrongful Acts, errors or omissions committed by or at the direction of the Insured.

b) For liability arising out of the Insured's services and/or capacity as:

1) an officer, director, partner, trustee, or employee of a business enterprise not named in the Declarations or a charitable organization or pension, welfare, profit sharing, mutual or investment fund or trust; . . . .

¶9 Finally, Endorsement Number 10 of the policy reads in part as follows:

c) Defense, Investigation, and Settlement of Claim

1) With respect to the insurance afforded by this Policy, the Company shall have the right and duty to defend any Claim brought against the Insured alleging a covered Wrongful Act.

¶10 On December 23, 2008, ILDN West, LLC ("ILDN") filed a lawsuit against Titan, Oblio, Titan Communications, Inc. ("Titan Communications"), Planet Direct, Inc. ("Planet Direct"), Marks, Crivello, and Does 1-50 in the Superior Court of the State of California for the County of Los Angeles (the "ILDN action"). The complaint described Marks as "an individual residing at all material times in or around Dallas, Texas," and stated that "[a]t all times relevant hereto, Marks was a Chairman of Titan and represented Oblio, Titan Communications and Planet Direct." The complaint asserted seven causes of action: breach of contract against Titan, Titan Communications, and Planet Direct; breach of contract against Oblio, Titan Communications, and

6

Planet Direct; breach of guaranty against Titan; fraud against Titan, Marks, and Crivello; negligent misrepresentation against Titan, Marks, and Crivello; quantum meruit/unjust enrichment against Titan, Oblio, Titan Communications, and Planet Direct; and "account stated"[7] against Titan, Oblio, Titan Communications, and Planet Direct.[8]

¶11 On February 2, 2009, George L. Miller, Chapter 7 Trustee of the Estate of USA Detergents, Inc. ("USAD"), filed a lawsuit against Greystone Business Credit II, LLC. ("Greystone"), GBC Funding, L.L.C. ("GBC"), Titan, Frank Orlando ("Orlando"), Chance, R. Scott Hensell ("Hensell"), Marks, Titan PCB West, Inc., n/k/a Titan Electronics, Inc. ("Titan PCB West"), Titan PCB East, Inc., n/k/a Titan East, Inc. ("Titan PCB East"), Oblio, Titan Wireless Communications, Inc. ("Titan Wireless"), StartTalk Inc. ("StartTalk"), Pinless, Inc. ("Pinless"), Appalachian Oil Company ("Appalachian"), Appco-Ky, Inc. ("Appco"), and Crivello in the United States Bankruptcy Court for the District of Delaware (the "USAD action"). The

---

[7] "Generally, an account stated is defined as an agreement between parties who have had previous transactions of a monetary character that all the items of the account representing those transactions, and the balance struck, are correct, together with a promise, express or implied, for the payment of that balance." 1A C.J.S. Account Stated § 1 (2016).

[8] The ILDN action concerns debts allegedly due ILDN by the defendants in that suit for telecommunications services provided to the defendants by ILDN, and allegedly false representations made by certain of the defendants to ILDN regarding payment of those debts.

complaint described Marks as "a citizen of Wisconsin," "Chairman of the Board of Directors of USAD at some point after August 1, 2007," and, "[a]t all material times hereto," "Chairman of Titan and a Member of Crivello Group[, LLC]."[9]

¶12 The complaint asserted nine counts: to avoid and recover preferential transfers pursuant to 11 U.S.C. §§ 547 and 550 against Greystone and GBC; to avoid and recover preferential transfers pursuant to 11 U.S.C. §§ 547 and 550 against Greystone, GBC, Titan, Titan PCB West, Titan PCB East, Oblio, Titan Wireless, StartTalk, Pinless, Appalachian, and Appco; disallowance of all claims pursuant to 11 U.S.C. § 502(d) against Greystone and GBC; objection to proof of claim pursuant to 11 U.S.C. § 502 against Greystone and GBC; equitable subordination pursuant to 11 U.S.C. § 510(c) against Greystone and GBC; breach of fiduciary duty against Orlando, Chance, Hensell, and Marks; aiding and abetting breach of fiduciary duty against Greystone, GBC, Titan, and Crivello; civil conspiracy

---

[9] The allegations in this lawsuit concern Titan's acquisition of a controlling interest in USAD, "a manufacturer and distributor of value priced and mid-priced laundry care products, household cleaners, personal care items, candles and air fresheners." The complaints allege that Titan's operation of USAD enriched the defendants at the expense of USAD and its creditors. More specifically, the complaint alleges that the defendants should have either recapitalized or liquidated USAD "for the benefit of all creditors," but "chose instead wrongfully to perpetuate the USAD entity" for the defendants' own benefit. Additionally, the complaint alleges that the defendants "orchestrated and/or compelled the payment of preferential transfers for their own benefit at the expense of USAD and its creditors."

against Greystone, GBC, Titan, Orlando, Chance, Hensell, Marks, and Crivello; and for an accounting against Greystone and GBC.

¶13 On or about May 4, 2009, Phillip L. Near filed a lawsuit against Titan, Crivello, Marks, Chance, Greystone, and Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd. ("Goldberg Kohn") in the United States District Court for the District of Kansas (the "Near action"). The complaint described Marks as "a resident of Wisconsin," "the Chairman of Titan and, through one or more of his business entities, a shareholder of Titan." The complaint also stated that Marks "claims to be a director of Crescent."[10] The complaint asserted ten counts: fraud against Titan, Crivello, Marks, and Chance; fraudulent inducement against Titan, Crivello, Marks, and Chance; negligent misrepresentation against Titan, Crivello, Marks, and Chance; fraud by silence against Titan, Crivello, Marks, and Chance; breach of contract against Titan; conversion against Titan, Crivello, Marks, and Chance; conversion against Greystone; conversion against Goldberg Kohn; civil conspiracy against all

---

[10] "Crescent" refers to Crescent Fuels, Inc. and its subsidiaries, including Crescent Oil Company, Inc., Crescent Corporation, Crescent Stores Corporation, Crescent Holdings, Inc., and Crescent Realty, Inc.

the defendants; and breach of fiduciary duty against Goldberg Kohn.[11]

¶14 On July 1, 2009, Lanny Houillion filed a lawsuit against Chance, Hensell, Oblio, Titan, and Marks in the County Court of Dallas (the "Houillion action"). The complaint described Marks as "an individual and Chairman of the Board for [Titan]."[12] The complaint asserted three causes of action against the defendants: breach of contract; negligence; and fraud.[13]

¶15 On July 10, 2009, Appalachian filed a lawsuit against Titan, Marks, Chance, and Hensell, "individually, and in their capacities as directors of [Appalachian]," in the United States Bankruptcy Court for the Eastern District of Tennessee (the "Appalachian action"). The complaint described Marks as "an individual residing in Milwaukee, Wisconsin," "a member of [Appalachian's] Board of Directors at all times relevant to this

---

[11] The Near action alleges that Near "lost his company, his life savings, and his business reputation by the repugnant, fraudulent, and unlawful conduct of the Defendants." Near contends that Titan acquired an interest in Crescent, a company involved in the fuel distribution industry, "looted" Crescent for "millions of dollars," terminated Near, who was once president and majority shareholder of Crescent Fuels, Inc., and left him liable to other entities for millions of dollars in personal guarantees.

[12] The complaint is titled "Plaintiff's First Amended Original Petition." No other petition is in the record.

[13] The Houillion action involves an alleged breach of a commercial lease agreement between the defendants in that case and Houillion.

Complaint," and "an 'Insider' of [Appalachian] as defined in § 101(31) of the Bankruptcy Code."

¶16 The complaint asserted six counts: to avoid fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and recover fraudulent transfers pursuant to 11 U.S.C. § 550 against Titan; to avoid fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and recover fraudulent transfers pursuant to 11 U.S.C. § 550 against Titan; to avoid fraudulent conveyances pursuant to 11 U.S.C. § 544 and applicable state law and to recover fraudulent conveyances pursuant to 11 U.S.C. § 550 against Titan; to avoid preferential transfers pursuant to 11 U.S.C. § 547 and recover preferential transfers pursuant to 11 U.S.C. § 550 against Titan; to avoid wrongful distributions to shareholders pursuant to T.C.A. § 48-16-401(C) [of the Tennessee Code] against Titan; and to recover wrongful distributions to shareholders pursuant to T.C.A. § 48-18-304 [of the Tennessee Code] against the director defendants.[14]

¶17 Except as detailed below with regard to certain supplemental counterclaims in the Hawaii Global action, the parties do not point us to any language in the complaints that

---

[14] The Appalachian action involves allegations that Titan became the 100 percent shareholder of Appalachian, after which Titan began "to cause [Appalachian] to transfer large amounts of cash to Titan for its own use . . . with full knowledge that [Appalachian] (i) was insolvent and (ii) did not have sufficient capital to operate."

11

reference ICT, ICT2, or Marks' position as trustee of ICT and ICT2.

¶18 On July 28, 2009, Marks provided notice of each lawsuit——the Hawaii Global action, the ILDN action, the USAD action, the Near action, the Houillion action, and the Appalachian action——to Houston Casualty. In letters to Marks dated July 30, 2009, Professional Indemnity Agency, Inc. ("Professional Indemnity") acknowledged receipt of the six claims on behalf of Houston Casualty and stated that it was "presently in the process of establishing a claim file and reviewing the information provided."

¶19 On October 23, 2009, Marks filed a complaint against Houston Casualty in Milwaukee County circuit court alleging, among other things, breach of Houston Casualty's duty to defend Marks in each of the six lawsuits discussed and denial of Marks' six claims in bad faith.[15]

¶20 On October 27, 2009, Hawaii Global and TransPac Telecom, Inc. ("TransPac")——parties in the earliest of the lawsuits discussed above, the Hawaii Global action——filed a "Motion for Leave to File Supplemental and Amended Counterclaims."

¶21 On October 28, 2009, Marks notified Houston Casualty of Hawaii Global and TransPac's motion. The same day, Marks' policy expired.

---

[15] Neither party argues that it was improper to bring this suit in Wisconsin.

¶22 In letters dated November 4, 2009, Professional Indemnity informed Marks on behalf of Houston Casualty that Houston Casualty had "determined that it has no obligation under the Policy either to defend or indemnify you . . . in connection with" any of the six lawsuits. Although the letters provided multiple reasons for Houston's refusal to defend or indemnify Marks, two are most relevant to this appeal: (1) the alleged conduct giving rise to the claims did "not arise out of the performance of services by the Insured as the Trustee of the Irrevocable Children's Trust and/or Irrevocable Children's Trust No. 2, for a fee"; and (2) exclusion b)1) (the "business enterprise exclusion") excluded any indemnity obligation for liability arising out of Marks' services and/or capacity as an officer, director, partner, trustee, or employee of a business enterprise not named in the declarations of the policy.[16]

---

[16] The policy at issue in this appeal is numbered H708-15868. When Marks notified Houston Casualty of the lawsuits against him, he listed the applicable policy as policy H708-15868. Five out of the six letters sent from Houston Casualty to Marks listed the applicable policy as policy H708-15868. However, the letter tied to the Hawaii Global action lists the applicable policy as policy H707-16515. This is the number of a previous policy Marks had obtained from Houston Casualty and which had a policy term of October 28, 2007, to October 28, 2008.

(continued)

13

¶23 On November 16, 2009, Houston Casualty filed a notice of removal to the United States District Court for the Eastern District of Wisconsin.

¶24 On November 17, 2009, Marks voluntarily dismissed his case and again filed a complaint against Houston Casualty in Milwaukee County circuit court alleging, among other things, breach of Houston Casualty's duty to defend Marks in each of the six lawsuits discussed and denial of Marks' six claims in bad faith. This second complaint, unlike the first, named Bedford Underwriters as a defendant.

¶25 On December 18, 2009, Houston Casualty again removed the case to federal court. On March 22, 2010, the case was remanded to state court.

¶26 On January 21, 2010, the United States District Court for the Northern District of Texas granted Hawaii Global and TransPac's "Motion for Leave to File Supplemental and Amended

---

The reason for this discrepancy is likely because Hawaii Global filed its counterclaim on April 7, 2008, a date within the policy term of policy H707-16515, not policy H708-15868. However, Marks' complaint against Houston Casualty discusses policy No. H708-15868, arguing that "[t]here is at least one claim within the four corners of each and every one of the complaints in the six lawsuits that arguably and/or actually triggers coverage under the Policy" (the "Policy" being policy H708-15868). The complaint notes only in passing that "[t]he Policy was a renewal of policy H707-16515." Unfortunately, the parties do not discuss these seemingly significant facts.

We will address Marks' arguments as he has made them. We note that the letter from Houston Casualty denying coverage for the Hawaii Global action provides the same two reasons for the denial as are set out above.

14

Counterclaims." On January 25, 2010, Hawaii Global and TransPac Telecom, Inc. filed supplemental counterclaims against

> [Crivello], both individually and as settlor, de facto trustee and de facto beneficiary of the Irrevocable Children's Trust and Irrevocable Children's Trust 2, [Marks], both individually and as trustee of the Irrevocable Children's Trust and Irrevocable Children's Trust 2, . . . the Irrevocable Children's Trust[,] . . . the Irrevocable Children's Trust 2 [,] . . . Crivello Group LLC[,] . . . Phoenix Investors LLC[,] . . . and Farwell Equity Partners LLC.

The counterclaims collectively refer to these latter five entities as the "Crivello Family Interests," and assert that they are "a group of trusts, limited liability companies and/or corporations owned or controlled by Crivello and managed by Crivello and Marks."

¶27 The supplemental counterclaims described Marks as "a citizen of the State of Wisconsin" and further stated:

> According to Titan's 10-K for the fiscal year ending August 31, 2008,
>
> > Mr. Marks has served as Trustee of Irrevocable Children's Trust and Irrevocable Children's Trust No. 2 since 1994. Irrevocable Children's Trust and Irrevocable Children's Trust No. 2 currently have an ownership or investment interest in commercial properties, private residences, natural resources, telecommunications, and technology companies, and other business and investment ventures. Mr. Marks has the responsibility in overseeing all investments by Irrevocable Children's Trust and Irrevocable Children's Trust No. 2 with responsibilities beginning at acquisition and continuing through ownership. Mr. Marks generally acts in the capacity of officer or director for all of the operating companies

15

that are vehicles for investments by the Trusts and is involved in strategic planning, and major decision-making.

In addition to his individual capacity, Marks is being added in a representative capacity as ostensible trustee and chairman of Crivello-controlled alter ego entities alleged herein.

¶28 Hawaii Global alleges, among other things, that "[i]n their various capacities as settlor, de facto trustee, trustee, de facto beneficiaries, shareholders, board members and/or officers, Crivello and Marks have caused the Crivello Family Interests to intentionally misappropriate and shield assets obtained through fraud and artifice."

¶29 The counterclaims asserted three causes of action: alter ego; RICO conspiracy against the Crivello Family Interests; and fraudulent transfer against all counterclaim defendants.[17]

¶30 On October 28, 2010, Marks filed an amended complaint.

¶31 On February 8, 2013, Houston Casualty and Marks filed motions for summary judgment in Marks' lawsuit against Houston Casualty in Milwaukee County circuit court. Marks made four arguments relevant to this appeal. First, he argued that although his policy covered only liability arising out of his

---

[17] Although only one count had been asserted in Hawaii Global's original counterclaim, the supplemental counterclaims began at count three. The filing, does, however, refer to "claims and allegations set forth in . . . the Complaint transferred from Hawaii [Global] . . . and consolidated in this action." The parties do not discuss any such transferred complaint, so we do not address it. See also supra, ¶5 & n.6.

16

"performance of services as the Trustee of the Irrevocable Children's Trust (ICT), and/or Irrevocable Children's Trust No. 2 (ICT2), for a fee," the language in Marks' policy does not "define the scope of services that are covered when performed by the trustee." More specifically, "Marks was sued in all six lawsuits because he was a director of Titan, and . . . Marks was on the board of directors of Titan only by virtue of the trusts' controlling investment position in Titan." Second, Marks claimed he was sued in the Hawaii Global action "because of his position as trustee of ICT and ICT2." Third, Marks argued that, in determining whether an insurer has breached its duty to defend an insured, a court may not consider exclusions or limiting language in the insurance policy at issue if the insurer had earlier rejected the insured's tender of defense without having coverage determined by a court. Fourth, Marks asserted that the business enterprise exclusion in the Houston Casualty policy rendered the entire policy illusory, because it excluded coverage for liability arising out of Marks' "services and/or capacity as . . . an . . . trustee . . . of a . . . trust."

¶32 On October 4, 2013, the circuit court issued an order granting Houston Casualty's motion for summary judgment and denying Marks' motion for summary judgment. The circuit court determined that Marks' policy, "when construed liberally, . . . can be read to cover the work of a trustee when working as an officer or director of a corporation in which the trust corpus is [invested]." Further, the court found that the

17

"allegations of the six lawsuits against Mr. Marks as presented within the four corners of the pleadings fall within the scope of the insuring [clause]." However, the court also found that the business enterprise exclusion did not render the insurance policy illusory, "is enforceable[,] and does preclude coverage for the claims in this case." Thus, the court concluded that Houston Casualty had not breached any duty to defend Marks. On October 31, 2013, the court dismissed the case.

¶33 On December 13, 2013, Marks filed a notice of appeal. On January 10, 2014, Houston Casualty filed a notice of cross-appeal. On May 7, 2015, the court of appeals "affirm[ed] the circuit court's determination that Houston Casualty did not have a duty to defend Marks." Marks, 363 Wis. 2d 505, ¶1. Like the circuit court, the court of appeals concluded that the business enterprise exclusion in the Houston Casualty policy precluded coverage and did not render the policy illusory. Id., ¶¶17-27.[18] The court thus found it unnecessary to consider Houston Casualty's argument that its policy did not even provide an initial grant of coverage. Id., ¶1.

¶34 On July 6, 2015, Marks filed a petition for review in this court. On September 15, 2015, we granted the petition.

---

[18] As we will discuss below, the court of appeals tussled with some of its prior cases before arriving at its conclusion. See, e.g., Marks v. Houston Cas. Co., 2015 WI App 44, ¶10, 363 Wis. 2d 505, 866 N.W.2d 393.

## II.  STANDARD OF REVIEW

¶35  "We review summary judgment rulings independently, applying the well-established standards set forth in Wis. Stat. § 802.08" (2013-14).[19]  Hirschhorn v. Auto-Owners Ins. Co., 2012 WI 20, ¶20, 338 Wis. 2d 761, 809 N.W.2d 529 (citations omitted). Specifically, summary judgment is granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  § 802.08(2); Hirschhorn, 338 Wis. 2d 761, ¶20 (citation omitted).

¶36  In this case we interpret an insurance contract.  "The interpretation of an insurance contract is a question of law, which this court reviews de novo."  Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶27, 315 Wis. 2d 556, 759 N.W.2d 613 (citation omitted).  We also examine the "four-corners rule," which is relevant in cases where an insured argues that its insurer breached its duty to defend the insured. See Olson v. Farrar, 2012 WI 3, ¶33, 338 Wis. 2d 215, 809 N.W.2d 1.  "The proper application of the four-corners rule presents a question of law, which we decide independently of the determinations rendered by the circuit court and the court of appeals."  Id., ¶22 (determining whether four-corners rule applies).

---

[19] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

III.  ANALYSIS

A.  General Principles Regarding an Insurer's
Contractual Duty to Defend Its Insured

¶37 Liability insurance policies often contractually obligate an insurer both to defend and to indemnify its insured. Maxwell v. Hartford Union High Sch. Dist., 2012 WI 58, ¶53, 341 Wis. 2d 238, 814 N.W.2d 484. Generally speaking, what is meant when courts reference an insurer's "duty to defend" its insured is the insurer's "responsibility to defend the insured from all actions brought against the insured based on alleged facts or circumstances falling within the purview of coverage under the policy, regardless of the suit's validity or invalidity."  14 Steven Plitt et al., Couch on Insurance § 200:1 (3d ed. 2015) (citations omitted).  An insurer's duty to indemnify its insured, in contrast, is the insurer's duty "to pay all covered claims and judgments against [its] insured."  Id. § 200:3 (citations omitted).

¶38  When an insurer receives a tender of defense from its insured, it "makes an initial determination about whether it will defend its insured."  Olson, 338 Wis. 2d 215, ¶33.  The insurer must make this determination carefully, because if it refuses to defend and is later found to have "breache[d] a duty to defend its insured, [it] is on the hook for all damages that result from that breach of its duty."  Maxwell, 341 Wis. 2d 238, ¶54.[20]

---

[20] See also infra, ¶63 n.29.

¶39 Both insurers in making this initial determination and courts in examining whether an insurer has breached its duty to defend its insured use the same analytical framework, known in Wisconsin as the "four-corners rule." See Olson, 338 Wis. 2d 215, ¶33. The name derives from the fact that "[t]he duty to defend is triggered by the allegations contained within the four corners of the complaint" against the insured. Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶20, 311 Wis. 2d 548, 751 N.W.2d 845 (citations omitted). Put differently, "[w]hen a complaint alleges facts that, if proven, would constitute a covered claim, the insurer must appoint defense counsel for its insured without looking beyond the complaint's four corners." Id., ¶27. Thus, only two documents are germane in any four-corners analysis: the insurance policy and the complaint against the insured. No examination of extrinsic facts or evidence takes place. Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶19, 261 Wis. 2d 4, 660 N.W.2d 666.

¶40 The four-corners rule is "well established" in Wisconsin, Fireman's Fund, 261 Wis. 2d 4, ¶18, and is set out in detail in Estate of Sustache:

> An insurer's duty to defend its insured is determined by comparing the allegations of the complaint to the terms of the insurance policy. . . . It is the nature of the alleged claim that is controlling, even though the suit may be groundless, false, or fraudulent. . . .
>
> Courts liberally construe the allegations in the complaint and assume all reasonable inferences. This

21

rule tends to help an insured's demand for coverage. As usual, ambiguity in the coverage terms will be construed against the insurer. This familiar rule of contract construction also helps the insured.

In determining whether there is a duty to defend, the court first considers whether the insuring agreement makes an initial grant of coverage——i.e., whether the insurer has a duty to indemnify its insured——for the claims asserted. If the court determines that the policy was not intended to cover the claims asserted, the inquiry ends. . . .

Only after concluding that coverage exists does the court examine the policy's exclusions to determine whether they preclude coverage. In other words, when a court determines that there is no coverage in the policy for the allegations in the complaint, it is not necessary to interpret the policy's exclusions.

Estate of Sustache, 311 Wis. 2d 548, ¶¶20-23 (citations omitted). We add to this summary that a consideration of exclusions in the insurance policy necessarily includes consideration of any exceptions to those exclusions. See, e.g., Prof'l Office Bldgs., Inc. v. Royal Indem. Co., 145 Wis. 2d 573, 578-79, 580-84, 427 N.W.2d 427 (Ct. App. 1998).

¶41 Importantly, the four-corners rule generally protects the insured: "[W]ithout the four-corners rule, 'the duty to defend would often be empty. The insurance company could refuse to defend in the hope that the facts as they emerged in the litigation that its insured had asked it to defend would reveal that there was no coverage.'" Olson, 338 Wis. 2d 215, ¶32 (citation omitted). Moreover, "an insurer may have a clear duty to defend a claim that is utterly specious because, if it were meritorious, it would be covered." Fireman's Fund, 261 Wis. 2d 4, ¶21. One commentator notes:

22

The complaint test, literally applied, usually will preclude insurers from rejecting tenders of defense based on policy exclusions. The reason is that most complaints simply allege that the insured was negligent and that bodily injury or property damage resulted. These kinds of allegations almost always give rise to a duty to defend under the coverage clauses of standard liability policies. The applicability of an exclusion, however, is rarely obvious from the allegations in the complaint. Insurers often have to rely on investigation, discovery and other information not stated in the complaint to determine whether an exclusion applies. The complaint test, rigidly enforced, forbids that. If the allegations fall within the coverage clause and are not on their face excluded, then the company must defend or promptly take steps to resolve its duty to defend in court.

Peter F. Mullaney, Liability Insurers' Duty to Defend, Wis. Law., at 10-11 (July 1995).[21]

---

[21] When an insurer receives a tender of defense from its insured, it can proceed in several different ways. See generally Sheila M. Sullivan et al., Anderson on Wisconsin Insurance Law § 7.54 (7th ed. 2015). For instance, it can: (1) "deny the tender of defense and state the grounds for deciding that the complaint does not trigger any obligation to defend under the policy," id.; see Liebovich v. Minnesota Ins. Co., 2008 WI 75, ¶55, 310 Wis. 2d 751, 751 N.W.2d 764; (2) "request a bifurcated trial on the issue of coverage while moving to stay proceedings on the merits of the liability action until the issue of coverage is resolved," Liebovich, 310 Wis. 2d 751, ¶55; (3) "provide a defense to the insured on the merits, under a reservation of rights, until the coverage issue is resolved," Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶25, 311 Wis. 2d 548, 751 N.W.2d 845; or (4) obtain a declaratory ruling, see Liebovich, 310 Wis. 2d 751, ¶55.

(continued)

¶42 A number of other legal principles beneficial to the insured are built into any four-corners analysis, some of which were noted above: (1) allegations in the complaint are construed liberally and all reasonable inferences are assumed, Estate of Sustache, 311 Wis. 2d 548, ¶21; (2) ambiguity in the insurance policy is construed against the insurer, id.; and (3) "when an insurance policy provides coverage for even one claim made in a lawsuit, the insurer is obligated to defend the entire suit," Fireman's Fund, 261 Wis. 2d 4, ¶21 (citation omitted).

¶43 With this general framework before us, we now examine whether the five complaints and one set of counterclaims against

In the current case, Houston Casualty decided on the first of the approaches listed above: deny the tender of defense and explain why it was doing so. When an "insurance company refuses to defend, it does so at its own peril." Elliott v. Donahue, 169 Wis. 2d 310, 321, 485 N.W.2d 403 (1992); accord, e.g., Olson v. Farrar, 2012 WI 3, ¶30, 338 Wis. 2d 215, 809 N.W.2d 1. As was explained earlier, "[t]he general rule is that where an insurer wrongfully refuses to defend on the grounds that the claim against the insured is not within the coverage of the policy, the insurer is guilty of a breach of contract which renders it liable to the insured for all damages that naturally flow from the breach." Newhouse v. Citizens Sec. Mut. Ins. Co., 176 Wis. 2d 824, 837, 501 N.W.2d 1 (1993) (emphasis added).

Certain of our past cases have "strongly encourage[d]" insurers to avoid "unilateral[] refus[al]" to defend their insureds. Liebovich, 310 Wis. 2d 751, ¶55. But we also recognize that in some cases it may be obvious to insurers that they have no duty to defend their insureds based on a comparison of the insurance policy with the complaint at issue. Insurance companies are in the business of risk. They are undoubtedly cognizant of the risk that inheres in denial of an insured's tender. Sheila M. Sullivan et al., supra, § 7:54 ("To be sure, when an insurance company denies and does nothing, it takes a risk. Insurance companies are aware of the risk . . . .").

24

Marks allege facts that, if proven, would constitute a claim covered under Marks' professional liability insurance policy. If they do not, Houston Casualty did not breach its duty to defend Marks when it denied Marks' tender of defense.

### B. Whether Houston Casualty Breached Its Duty to Defend Marks

#### 1. Initial Coverage

¶44 The four-corners rule dictates that we first examine whether Marks' policy provides an initial grant of coverage for the claims against Marks in the six lawsuits at issue. See Estate of Sustache, 311 Wis. 2d 548, ¶22.

¶45 As explained supra, Marks' policy provides coverage for

> any Loss and Claim Expenses . . . as the Insured acting in the profession described in Item 3 of the Declarations shall become legally obligated to pay for Claim or Claims first made against the Insured during the Policy Period by reason of any Wrongful Act by an Insured . . . .

(Emphasis added.) "Item 3 of the Declarations" in turn lists Marks' profession as follows: "[s]olely in the performance of services as the Trustee of the Irrevocable Children's Trust (ICT), and/or Irrevocable Children's Trust No. 2 (ICT2), for a fee." And, finally, "Wrongful Act" is defined in the policy to mean "any actual or alleged error or omission or breach of duty committed or alleged to have been committed or for failure to render such professional services as are customarily rendered in the profession of the Insured as stated in Item 3 of the Declarations."

25

¶46 Taken as a whole, the policy essentially provides coverage for liability arising out of mistakes Marks makes <u>in rendering services in his capacity as trustee of ICT and ICT2</u>. Though it does not affect our analysis, we note that such a scope of coverage is consistent with the type of policy Marks purchased: professional liability errors and omissions insurance.

> An errors-and-omissions policy is professional-liability insurance providing a specialized and limited type of coverage compared to general comprehensive insurance. It is designed to insure members of a particular professional group from liability arising out of the special risk such as negligence, omissions, mistakes and errors inherent in the practice of the profession. . . . These professional-liability policies differ in detail depending upon the company which issues them and are generally called malpractice insurance when issued to members of the healing profession where the exposure is largely bodily injury and errors-and-omissions insurance where the risk is primarily that of damage to intangible property such as coverage for attorneys, insurance agents, and architects.

<u>Grieb v. Citizens Cas. Co. of New York</u>, 33 Wis. 2d 552, 556-57, 148 N.W.2d 103 (1967).

¶47 The circuit court below found that Marks' policy provides an initial grant of coverage. The court of appeals assumed without deciding that Marks' policy provides an initial grant of coverage, then moved to step two: determining whether any exclusions preclude coverage. <u>Marks</u>, 363 Wis. 2d 505, ¶9. The court of appeals ultimately concluded that the business enterprise exclusion "precludes coverage when measured against the allegations in the complaints." <u>Id.</u>, ¶22. We agree with

26

the court of appeals on both counts: we need not and do not decide whether Marks' policy provides an initial grant of coverage based on the allegations in the six lawsuits, because, as we will now explain, the business enterprise exclusion clearly establishes that Houston Casualty could have no possible duty to indemnify Marks, even if the allegations in the complaints turned out to be true.  See Fireman's Fund, 261 Wis. 2d 4, ¶21.[22]  Thus, Houston Casualty did not breach its duty to defend Marks when it declined to defend him.

## 2.  The Business Enterprise Exclusion

¶48 The business enterprise exclusion in Marks' policy excludes coverage:

> b)  For liability arising out of the Insured's services and/or capacity as:
>
> > 1)  an officer, director, partner, trustee, or employee of a business enterprise not named in the Declarations or a charitable organization or pension, welfare, profit sharing, mutual or investment fund or trust . . . .

¶49 For purposes of this case, what is important is that the exclusion unambiguously precludes coverage for Marks' activities as an officer or director of any business enterprise

---

[22] We have significant doubts that Marks' policy provides even an initial grant of coverage in this case.  Were we to determine that Marks' policy does not provide an initial grant of coverage, however, our analysis would end and we might not reach the important issues set forth in Marks' petition for review.

not named in the declarations.[23]   The only entities even mentioned in the declarations are ICT and ICT2.[24]

¶50 We now turn to the complaints.   Except for the supplemental counterclaims in the Hawaii Global actions, which we will examine momentarily, the claims against Marks characterize Marks as follows: a "citizen of the State of Wisconsin" and "a principal shareholder and equitable owner of Titan" (the Hawaii Global action); "an individual residing at

---

[23] We refer to this exclusion as the "business enterprise exclusion" because it bears a resemblance to "a standard [type of] exclusion in lawyers' professional liability insurance policies" sometimes referred to as a business enterprise exclusion.   See, e.g., Am. Guarantee & Liab. Ins. Co. v. Timothy S. Keiter, P.A., 360 F.3d 13, 16-17 (1st Cir. 2004).

At least with respect to lawyers' professional liability insurance policies,

> Some courts have explained that standard business enterprise exclusions have two purposes:
>
> 1)   "to prevent collusive suits whereby malpractice coverage could be used to shift a lawyer's business loss onto the malpractice carrier" and 2) to avoid the circumstance where an insured so intermingles his business relationships with his law practice that an insurance carrier incurs additional risk of having to cover the insured for legal malpractice claims relating to the conduct of business, rather than solely out of the professional practice.

Id. at 17 (citation omitted).

[24] Marks points us to Black's Law Dictionary, which defines a "business enterprise" as "[a] for-profit company, business, or organization that provides financial, commercial, or industrial goods and services."   Business Enterprise, Black's Law Dictionary 240 (10th ed. 2014).

all material times in or around Dallas, Texas," and "[a]t all times relevant hereto . . . a Chairman of Titan and represent[ative] [of] Oblio, Titan Communications and Planet Direct" (the ILDN action); "a citizen of Wisconsin," "Chairman of the Board of Directors of USAD at some point after August 1, 2007," and, "at all material times hereto," "Chairman of Titan and a Member of Crivello Group[, LLC]" (the USAD action); "a resident of Wisconsin," "the Chairman of Titan," "through one or more of his business entities, a shareholder of Titan," and "a [putative] director of Crescent" (the Near action); "an individual and Chairman of the Board for [Titan]" (the Houillion action); and "an individual residing in Milwaukee, Wisconsin," "a member of [Appalachian's] Board of Directors at all [relevant] times," and "an 'Insider' of [Appalachian] as defined in § 101(31) of the Bankruptcy Code" (the Appalachian action).

¶51 Conspicuously absent from these characterizations is any mention of Marks' position as trustee of ICT and ICT2. In fact, the allegations in the complaints do not discuss ICT and ICT2 at all. Instead, the various claims against Marks attack him in his capacity as an officer or director of Titan, a business enterprise not named in the declarations, as well as in his capacity as an officer or director of other business enterprises not named in the declarations. And, quite simply, the business enterprise exclusion of Marks' policy makes clear that the policy does not provide coverage for Marks' liability as a director or officer of Titan or other business enterprises not mentioned in the policy's declarations. The phrasing of the

29

business enterprise exclusion itself suggests how Marks <u>could</u> have obtained coverage for his work as director or officer of Titan: he could have bargained for and obtained a policy that "named" Titan "in [its] Declarations." He did not do so, and may not now force Houston Casualty to participate in lawsuits not contemplated by the contract between it and Marks.

¶52 We acknowledge that ICT and ICT2 owned a controlling interest in Titan. Marks explains that "[i]n order to properly and effectively manage the trusts' significant investment in Titan, Marks accepted a seat on the Titan board of directors and assumed the role of chairman," and that "Marks' professional positions with Titan were solely by virtue of the trusts' controlling investments in Titan." Even if true, these facts do not change our conclusion. At most, Marks has merely identified a causal relationship: his position as trustee of ICT and ICT2 led him to accept a role as officer or director of Titan. However, that alleged connection is nonetheless deficient as Marks is being sued for his alleged failures as officer or director of Titan, not for any alleged failures as trustee of ICT and ICT2.

¶53 The supplemental counterclaims against Marks in the Hawaii Global action were filed almost six months after Marks notified Houston Casualty of the lawsuits against him, almost three months after Marks' policy expired and Houston Casualty informed Marks it had no obligation to defend him, and over two months after Marks initially filed this lawsuit against Houston Casualty alleging breach of its duty to defend him. Those 2010

30

counterclaims were not a part of Houston Casualty's 2009 duty to defend analysis and are not a part of our duty to defend analysis.[25]

---

[25] Marks points out that on October 28, 2009, he notified Houston Casualty that Hawaii Global and TransPac had filed a "Motion for Leave to File Supplemental and Amended Counterclaims." But "[t]he duty to defend is based solely on the allegations 'contained within the four corners of the complaint,' without resort to extrinsic facts or evidence," Fireman's Fund Ins. Co. v. Bradley Corp., 2003 WI 33, ¶19, 261 Wis. 2d 4, 660 N.W.2d 666 (emphasis added) (citation omitted), which is what Hawaii Global and TransPac's motion amounts to, despite its formal trappings. Marks suggests his October 28, 2009 letter to Houston Casualty was "proper notice of claim," but no such "claim" had yet been made. Those supplemental claims would not be made until January 25, 2010. Cf. Amerisure Mut. Ins. Co. v. Microplastics, Inc., 622 F.3d 806, 812 (7th Cir. 2010) (Illinois law) ("[I]t is the actual complaint, not some hypothetical version, that must be considered." (citation omitted).); Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., 598 F.3d 257, 273 (6th Cir. 2010) (Kentucky law) (pursuant to duty to defend analysis, draft complaint attached as an exhibit to a motion for reconsideration would not be considered filed as a complaint on that day).

(continued)

31

¶54 To summarize, Marks obtained a professional liability policy from Houston Casualty for his work as trustee of two trusts. He was sued multiple times for activities pertaining to his performance as an officer or director of various businesses affiliated with those trusts, but these lawsuits had nothing to do with Marks' services as trustee of those trusts. When Houston Casualty received Marks' request for a defense, it examined Marks' policy and the complaints at issue, and reasonably made the same conclusion that we do today: Houston Casualty had no duty to defend Marks based on the claims asserted against him.

¶55 Ordinarily, our analysis would end here. Perhaps realizing the weakness of his position given the plain terms of the business enterprise exclusion, however, Marks provides two

Although there was brief reference to it in the proceedings below, we are not faced with a developed argument that Houston Casualty separately breached a duty to defend on January 25, 2010, a date which is outside of the applicable policy period. Such a claim would face its own hurdles, including: (1) the question of whether these counterclaims survive the business enterprise exclusion; (2) application of Marks' policy's intentional acts exclusion (in fact, although the circuit court concluded otherwise, Marks conceded before the circuit court that "Hawaii Global alleged only intentional acts"); and (3) an argument we have not otherwise addressed——the possibility that the Hawaii Global counterclaims should be read to date back to April 7, 2008, the original filing date of Hawaii Global's counterclaim and a date which is also outside of the applicable policy period. With regard to this last issue, we note that a section of Marks' policy titled "Multiple Claims" reads: "One or more Claims based upon or arising out of the Same Wrongful Act or Interrelated Wrongful Acts by one or more of the Insureds shall be considered a single claim." See also supra, n. 16.

reasons why we should not give effect to the business enterprise exclusion at all: (1) the exclusion renders the policy illusory, so we must interpret the policy in favor of coverage; and (2) because Houston Casualty "unilaterally disclaim[ed] coverage," it is "estopped from using policy exclusions to litigate coverage if it is sued for breaching its duty to defend."  Both arguments are without merit.

### C.  Whether the Business Enterprise Exclusion Renders the Houston Casualty Policy Illusory

¶56  "Insurance policies are contracts and are governed by the same rules that govern interpretation of contracts in general."  Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶23, 233 Wis. 2d 314, 607 N.W.2d 276 (citation omitted).  "In order that a contract may arise, three things must concur: first, the offer; second, the acceptance; and, third, the consideration."  Briggs v. Miller, 176 Wis. 321, 325, 186 N.W. 163 (1922).  "Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration."  3 Williston on Contracts § 7:7 (4th ed.).  In the insurance context, "[i]llusory policy language defines coverage in a manner that coverage will never actually be triggered."  Continental Western Ins. Co. v. Paul Reid, LLP, 2006 WI App 89, ¶7, 292 Wis. 2d 674, 715 N.W.2d 689 (citation omitted).  "Where a policy's purported coverage is illusory, the policy may be reformed to meet an

33

insured's reasonable expectations of coverage." Id.[26] We stress that "reformation is an extraordinary remedy, and . . . courts exercise it with great caution and restraint." 43 Am. Jur. 2d Insurance § 358 (citing Haddad v. Elkhateeb, 46 So. 3d 244, 255 (La. Ct. App. 4th Cir. 2010)); see also, e.g., Kansas v. Nebraska, 575 U.S. ___, 135 S. Ct. 1042, 1061 (2015) ("Of course, courts generally hold parties to the deals they make; and of course, courts should hesitate, and then hesitate some more, before modifying a contract, even to remove an inadvertent flaw."); 2 Steven Plitt et al., Couch on Insurance § 26:1 ("Reformation is an extraordinary remedy . . . . Accordingly, the courts exercise it with great caution" (citing Mutual of Omaha Ins. Co. v. Russell, 402 F.2d 339 (10th Cir. 1968).).[27]

---

[26] This statement of law is, in some sense, incomplete. Generally, the insurer's understanding of the contract is also of critical concern when reforming a policy. See infra, n.27; Vandenberg v. Continental Ins. Co., 2001 WI 85, ¶53, 244 Wis. 2d 802, 628 N.W.2d 876 ("In the context of insurance contracts, there are special considerations regarding reformation. . . . [A] policy may not be rewritten to bind the insurer to a risk that it did not contemplate and for which it received no premium.").

[27] "Reformation is an equitable remedy which emanates from the maxim that equity treats that as done which ought to have been done. . . . Reformation may be granted only in two narrow circumstances: Mutual mistake, or unilateral mistake plus fraudulent concealment." 27 Williston on Contracts § 70:19 (4th ed.). With regard to the first of these circumstances,

> [t]he purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was mutual assent. While the erroneous instrument must be made to correctly express the real agreement between

(continued)

34

¶57 Marks argues that the business enterprise exclusion "completely swallows the coverage granted in the insuring agreement" of his policy because it excludes coverage "[f]or liability arising out of the Insured's services and/or capacity as: an . . . trustee . . . of . . . a . . . trust . . . ." Thus, Mark concludes, this court must "reform the policy in favor of coverage." This argument, though perhaps clever, does not withstand scrutiny.

¶58 Marks essentially contends that because a portion of the business enterprise exclusion <u>not at issue</u> (the trustee/trust portion of the exclusion) renders the policy

---

the parties, <u>no court can make a new contract for the parties</u>.

<u>Id.</u> (emphases added) (citations omitted); <u>see also</u> 2 Steven Plitt et al., <u>Couch on Insurance</u> § 26:1 (3d ed. 2015) ("[A]n insurance policy is subject to reformation precisely as any other written instrument upon the same grounds and subject to the same limitations. . . . Reformation is a proper remedy where the parties have reached a definite and explicit agreement. There must be an understanding that there is an agreement, but whether by mutual or common mistake, or mistake on one side and fraud or inequitable conduct on the other, the written contract fails to express the agreement; in which case, the policy will be corrected so as to make it conform to their real intent, and the parties will be placed as they would have stood if the mistake had not occurred." (citations omitted)).

Such are the general principles. Also present in Wisconsin case law is the recognition that "[i]n insurance cases less is required to make out a cause of action for reformation than in ordinary contract disputes." <u>Artmar, Inc. v. United Fire & Cas. Co.</u>, 34 Wis. 2d 181, 186, 148 N.W.2d 641 (1967). This case does not require us to delve into the niceties of insurance policy reformation, but we raise these issues to emphasize that reformation is not a tool to be applied casually.

35

illusory, we should provide coverage otherwise eliminated by a separate portion of the business enterprise exclusion (the officer-director/business enterprise portion of the exclusion).

¶59 Even if Marks is correct in his interpretation of the policy, our task would be to reform the policy so that it "conform[s] to [the] real intent" of the parties; that is, to reform the policy so that it represents the "definite and explicit agreement" originally reached by the parties before any mistake occurred. 2 Plitt et al., supra § 26:1; see also Vandenberg v. Continental Ins. Co., 2001 WI 85, ¶50 & n.35, 244 Wis. 2d 802, 628 N.W.2d 876. If a clause in Marks' policy renders the policy illusory, we consider whether to reform that clause. We do not consider whether to reform other clauses, simply because they too eliminate coverage.

¶60 The coverage provision of Marks' policy establishes that Marks is covered for liability arising out of his "performance of services as the Trustee of the Irrevocable Children's Trust (ICT), and/or Irrevocable Children's Trust No. 2 (ICT2), for a fee." If Marks is correct in his interpretation of the business enterprise exclusion, reformation might be appropriate and we might excise the trustee/trust portion of that exclusion. We would not, however, absent other argument, excise other portions of the business enterprise exclusion not in conflict with the coverage provision of the policy. Houston Casualty is not arguing that the putative trustee/trust

36

exclusion applies to exclude coverage, and we need not examine it further.[28]

### D. Whether this Court Should, in Conducting Its Four-Corners Analysis, Consider the Exclusions in Marks' Policy

¶61 Marks also argues that the business enterprise exclusion does not apply in this case because "an insurer that unilaterally disclaims coverage and its duty to defend will be estopped from using policy exclusions or limiting language to litigate coverage if it is subsequently sued by its insured for breaching its duty to defend." Marks principally relies on three court of appeals cases for this proposition: Radke v. Fireman's Fund Insurance Co., 217 Wis. 2d 39, 577 N.W.2d 366 (Ct. App. 1998); Kenefick v. Hitchcock, 187 Wis. 2d 218, 522 N.W.2d 261 (Ct. App. 1994); and Grube v. Daun, 173 Wis. 2d 30, 496 N.W.2d 106 (Ct. App. 1992). As will be shown, Grube, the earliest of these cases, relied on an earlier case, Professional Office Bldgs., Inc. v. Royal Indemnity Co., 145 Wis. 2d 573, 427 N.W.2d 427 (Ct. App. 1988). We thus begin with Professional Office Buildings.

---

[28] This reasoning applies with equal force to Marks' contention that because the business enterprise exclusion is supposedly ambiguous, Houston Casualty was obligated to defend him. The fact that portions of Marks' policy not at issue (the trustee/trust portion of the business enterprise exclusion) may be ambiguous does not render the portion of the exclusion upon which Houston Casualty relied in denying Marks a defense (the officer-director/business enterprise portion of the business enterprise exclusion) ambiguous.

37

¶62 The facts in Professional Office Buildings stem from an airplane crash near Tupelo, Mississippi. Prof'l Office Bldgs., 145 Wis. 2d at 577. A passenger injured in the crash sued the corporate owner of the plane, Professional Office Buildings, Inc. ("POB"), which had leased the plane to another corporation at the time of the crash. Id. at 577-78. POB's insurer, Royal Indemnity Company ("Royal"), refused to defend it under two potentially applicable policies; Royal pointed to the coverage clause of one policy and an exclusion in the other policy. Id. at 578-79. POB sued Royal Indemnity alleging, among other things, breach of the duty to defend. Id. at 579.

¶63 After stating the four-corners rule, the court of appeals determined that Royal had a duty to defend POB. Id. at 580-83. Importantly, the court relied for its conclusion on an exception to the exclusion which had been cited by Royal to POB when it had denied POB a defense. Id. at 578, 583. The court then concluded that "an insurer, who has breached its duty to defend an insured, may be estopped from later challenging coverage." Id. at 584-85 (emphasis added). "Royal could have tried coverage prior to undertaking the liability defense. Where coverage is an issue, bifurcated trials are the norm. . . . Royal, having breached its duty to defend the Mississippi action, may not now challenge or otherwise litigate the coverage issues." Id. at 585-86. Professional Office

Buildings is consistent with our analysis in this case.[29] We proceed to examine Grube.

¶64 Grube involves many issues, and we recite only the portions of that opinion relevant to this appeal. In Grube Louis Achter ("Achter") sold property to John Daun ("Daun") without mentioning a gasoline leak that had occurred on the property. Grube, 173 Wis. 2d at 46-47. Daun sold the property to Gordon and Julie Grube ("the Grubes"). Id. at 47. The Grubes discovered that wells on the property had been contaminated by the leak, and a flurry of litigation ensued. Id. at 47-48. Relevant to this case, Achter sued his insurer, Secura Insurance ("Secura"), demanding a defense and insurance coverage. Id. at 48. The court of appeals concluded that "[n]egligence causing property damage was alleged [against Achter] and is covered under Achter's policy" and that Secura

---

[29] Lest we inadvertently undo recent work of this court, we observe our statement from a few years ago:

> When an insurer breaches a duty to defend its insured, the insurer is on the hook for all damages that result from that breach of its duty. . . .
>
> While these damage awards are sometimes framed as the insurer being "estopped" from denying coverage, see, e.g., Grube v. Daun, 173 Wis. 2d 30, 74, 496 N.W.2d 106 (Ct. App. 1992) . . . , they are the measure of damages actually caused by an insurer's breach of the contractual duty to defend, not an estoppel based on some otherwise inequitable conduct in the eyes of the insured.

Maxwell v. Hartford Union High Sch. Dist., 2012 WI 58, ¶¶54-55, 341 Wis. 2d 238, 814 N.W.2d 484.

39

was therefore required to provide a defense. Id. at 73. Secura "argue[d] that it did not have a duty to defend because the claims alleged fall within exclusions of the policy." Id. at 74. The court of appeals rejected the argument, stating, "We hold that under Professional Office Buildings, Secura is estopped from raising any challenges to coverage; it must both defend and indemnify Achter because Secura denied coverage outright." Id. at 74 (citation omitted).

¶65 The Grube court misinterpreted Professional Office Buildings. Important to the Professional Office Buildings. court's holding that Royal could not contest coverage was the fact that the court had already determined that Royal had breached its duty to defend POB——a determination made, notably, after the court analyzed an exclusion and an exception to that exclusion in POB's policy. Prof'l Office Bldgs., 145 Wis. 2d at 584-85. The Grube decision is also internally inconsistent in this regard; later in its analysis, the Grube court stated, "The issue in the instant case——whether an insurer who breached its duty to defend can later contest coverage——is identical to the issue in Professional Office [Buildings]." Grube, 173 Wis. 2d at 74-75 (emphasis added). The Grube court should have addressed Secura's exclusions argument.[30]

---

[30] It is not clear that examination of exclusions in the Secura policy would have changed the result in that case. The trial court in that case had concluded that an exclusion "for damage to the insured's own property did not apply as the property was no longer owned by Achter." Grube, 173 Wis. 2d at 49.

¶66 In Kenefick David and Carolyn Hitchcock ("the Hitchcocks") were sued by their neighbors, Emmett and Amelia Kenefick ("the Keneficks"), who alleged that gasoline tanks on the Hitchcock's property had leaked and contaminated the groundwater. Kenefick, 187 Wis. 2d at 221. The Hitchcocks eventually sued their insurer, Federated Mutual Insurance Company ("Federated"), claiming that it had breached its duty to defend them. Id. The details of the case are not particularly germane to this case because Marks relies on a single statement made by the Kenefick court at the beginning of its duty to defend analysis:

> The nature of [the Keneficks'] claim [against the Hitchcocks] is such that——ignoring, as we must at this stage of the inquiry, both the merits of the claim and any exclusionary or limiting terms and conditions of the policies and, further, resolving all doubts in favor of the insured——we cannot say that there was no duty on Federated's part to defend the action, at least up to the point that its policy defenses to coverage were resolved.

Id. at 232.

¶67 As noted in a treatise on Wisconsin insurance law, "that statement . . . does not cite to any supporting authority. This is probably because case after case in Wisconsin has held that an insurance company's obligation to defend is based on the entire contract." Sheila M. Sullivan et al., Anderson on Wisconsin Insurance Law § 7.23 (7th ed. 2015); see also Menasha Corp. v. Lumbermens Mut. Cas. Co., 361 F. Supp. 2d 887, 892-93 (E.D. Wis. 2005) ("Plaintiff also argues that in determining whether defendants had duties to defend, I may not consider

41

exclusions in their policies. Plaintiff bases this argument on statements in [Kenefick and Radke]. However, when addressing whether there is a duty to defend, Wisconsin courts frequently consider exclusions. . . . [D]espite the language in Radke and Kenefick, I will consider the exclusions in defendants' policies." (citations omitted)).

¶68 Moreover, the Kenefick court did not even apply the "estoppel" discussion in Grube; in fact, it recognized that unlike in Professional Office Buildings, the coverage and liability issues in Kenefick were bifurcated. Kenefick, 187 Wis. 2d at 233-34; see also id. at 235 n.7 ("There is no indication in Grube, however, that the insurer obtained a bifurcated trial as Federated did in this case. . . . Grube is inapposite.").[31]

¶69 Radke is the last case for our consideration. We need spend even less time with Radke because it simply quoted the

---

[31] In Kenefick the court concluded that Federated did not breach its duty to defend, although Federated did not, apparently, request bifurcation until six months after the complaint against the Keneficks was filed. Kenefick v. Hitchcock, 187 Wis. 2d 218, 233 & n.6, 522 N.W.2d 261 (Ct. App. 1994). The court remanded the case on the "very limited ground" that "if the Hitchcocks necessarily incurred expenses in defense of the liability and damage portions of the case prior to the time it was determined there was no coverage under the Federated policies, they could seek reimbursement from Federated." Id. at 236. We do not discuss the merits of this aspect of the Kenefick court's analysis, and our comment that Kenefick distinguished itself from Grube and Professional Office Buildings is not meant as an endorsement of that conclusion; we merely point out that the Kenefick court did not purport to apply the estoppel discussion in Grube.

statement from Kenefick just discussed. Radke, 217 Wis. 2d at 44 ("However, our inquiry at this stage is limited; we are required to ignore 'both the merits of the claim and any exclusionary or limiting terms and conditions of the policies.'" (quoting Kenefick, 187 Wis. 2d at 232)).

¶70 In sum, Marks' argument that we must ignore the business enterprise exclusion because Houston Casualty refused to defend him rests upon: (1) analysis in Grube based on a faulty reading of Professional Office Buildings; and (2) a statement in Kenefick that did not rely on any cases or other sources for support. We decline to rely on these statements, for multiple reasons.

¶71 First, as an original matter, a rule that an insurer who declines to provide a defense may not rely on policy exclusions to protect itself against allegations of breach of the duty to defend makes no sense. If A demands that B perform an action under a contract, B relies on a particular clause in the contract in refusing to perform that action, and A sues B for breach of contract, a court of necessity must interpret that clause in order to determine whether B in fact breached the contract. See Restatement (Second) of Contracts § 235 (1981) ("When performance of a duty under a contract is due any non-performance is a breach." (emphasis added)). The fact that that contract may sometimes be an insurance contract does not change the analysis. See Wis. Label Corp., 233 Wis. 2d 314, ¶23 ("Insurance policies are contracts and are governed by the same

43

rules that govern interpretation of contracts in general" (citation omitted).).

¶72 Insurers are not allowed to contest coverage <u>after</u> a court has determined that the insurer has breached the duty to defend its insured because, having breached a contractual obligation, the insurer must pay damages flowing from that breach. <u>Maxwell</u>, 341 Wis. 2d 238, ¶¶55-56 (citing <u>Prof'l Office Bldgs.</u>, 145 Wis. 2d at 585-86).[32] But if the insurer has <u>not</u> breached its duty to defend——something a court cannot determine based simply on the fact that the insurer declined to defend an action——then it is not obligated to pay out any damages. <u>See</u> Sullivan et al., <u>supra</u> ¶67, at § 11.100 ("If there is, in fact, no contract to defend an insured, an insurer should not have a duty to defend. If no duty to defend exists, there should be no waiver or estoppel for failure to respond to a tender of defense."); <u>Prod. Stamping Corp. v. Maryland Cas. Co.</u>, 199 Wis. 2d 322, 327, 544 N.W.2d 584 (Ct. App. 1996); <u>cf.</u> <u>Sisson v. Hansen Storage Co.</u>, 2008 WI App 111, ¶16, 313 Wis. 2d 411, 756 N.W.2d 667 ("Although it is risky for an insurance carrier to reject a tender of defense by its insured, the justified rejection of a tender does not create coverage where none exists . . . ."). In the current case, we needed to examine the business enterprise exclusion to determine whether Houston Casualty had breached its duty to defend Marks.

---

[32] <u>See</u> <u>supra</u>, ¶63 n.29.

44

¶73 Second, as we have explained, Grube, Kenefick, and Radke are inconsistent with a long line of Wisconsin case law. See, e.g., Liebovich v. Minnesota Ins. Co., 2008 WI 75, ¶¶2, 13, 310 Wis. 2d 751, 751 N.W.2d 764; Last v. Am. Family Mut. Ins. Co., 2000 WI App 169, ¶¶2-4, 9-10, 238 Wis. 2d 140, 617 N.W.2d 215; Bruner v. Heritage Companies, 225 Wis. 2d 728, 732-33, 737-40, 593 N.W.2d 814 (Ct. App. 1999); Production Stamping Corp., 199 Wis. 2d at 325-26, 329-31; Prof'l Office Bldgs., 145 Wis. 2d at 578-79, 580-83; Sola Basic Indus., Inc. v. U.S. Fid. & Guar. Co., 90 Wis. 2d 641, 644-47, 653-54 280 N.W.2d 211 (1979); Grieb v. Citizens Cas. Co. of New York, 33 Wis. 2d 552, 556-57, 148 N.W.2d 103 (1967).

¶74 Grube, Kenefick, and Radke constitute a stunted strand of law that conflicts with our four-corners jurisprudence; it also has produced uncertainty. See Menasha Corp. v. Lumbermens Mut. Cas. Co., 361 F. Supp. 2d 887, 893 (noting conflict and declining to apply Radke and Kenefick); Sullivan et al., supra ¶67, at § 7.23 (discussing Radke and Kenefick and noting that "case after case in Wisconsin has held that an insurance company's obligation to defend is based on the entire contract"). The court of appeals below recognized this. Marks, 363 Wis. 2d 505, ¶10 ("Marks accurately portrays the pertinent parts of Grube, Kenefick, and Radke. However, . . . in this respect the three cases impermissibly conflict with our earlier decision in Professional Office Bldgs."). The circuit court below recognized this ("[M]y first reaction was astonishment when Mr. Marks argued that there is a rule in Wisconsin that

45

forbids a court in coverage disputes from looking at the exclusions. . . . [I]t appears that Grube changed the rules set forth in Professional Office Bldgs. from a . . . process that makes estoppel contingent on coverage to a . . . process that makes estoppel automatic, regardless of coverage. And the dicta we read in Radke and Kenefick reflects the same kind of automatic rule . . . .").[33]

¶75 Grube, Kenefick, and Radke are "unsound in principle," and "detrimental to coherence and consistency in the law" insofar as they suggest that exclusions may not be considered in an analysis of whether an insurer has breached its duty to defend its insured simply because the insurer declined to defend its insured. Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶¶98-99, 264 Wis. 2d 60, 665 N.W.2d 257; see supra, ¶¶71-74. In order to resolve conflicting precedent in Wisconsin case law, we explicitly overrule any statements in these cases that suggest such an analysis is appropriate.

¶76 Accordingly, the business enterprise exclusion is properly considered in this case and establishes that Houston Casualty did not breach its duty to defend Marks.

---

[33] Indeed, even Marks seemingly recognized this conflict in his motion for summary judgment below, in which he noted "apparent tension in the law" between Grube, Kenefick, and Radke and "cases like Production Stamping [Corporation v. Maryland Casualty Company, 199 Wis. 2d 322, 544 N.W.2d 584 (Ct. App. 1996)]," a case which "cites to various portions of Kenefick . . . but . . . incorporated a policy exclusion into its duty to defend analysis."

E. Whether the Court of Appeals Complied with <u>Cook v. Cook</u>

¶77 We must address one final issue. As noted, the court of appeals below acknowledged it had erred in <u>Grube</u>, <u>Kenefick</u>, and <u>Radke</u>, stating, "Contrary to the approach that we applied in <u>Professional Office Bldgs.</u>, in <u>Grube</u> and more explicitly in <u>Kenefick</u> and <u>Radke</u>, we imposed a different and illogical hurdle for insurers." <u>Marks</u>, 363 Wis. 2d 505, ¶13. However, the court of appeals then took a further step. It concluded:

> To the extent. . . that in <u>Grube</u>, <u>Kenefick</u> and <u>Radke</u> we modified <u>Professional Office Bldgs.</u> as we have described, we agree with the circuit court that we lacked the authority to do so under <u>Cook v. Cook</u>, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (the court of appeals "must speak with a unified voice" and may not overrule, modify or withdraw language from its prior published decisions[).] Likewise, court of appeals cases may not conflict with supreme court precedent. <u>Id.</u> (the supreme court is the only court in the State of Wisconsin with the power to "overrule, modify or withdraw language from a previous supreme court case["].) Consequently, <u>Grube</u>, <u>Kenefick</u> and <u>Radke</u> do not establish precedent for the modification of how a claim of breach of duty to defend is evaluated. <u>See, e.g.</u>, <u>State v. Bolden</u>, 2003 WI App 155, ¶¶9-11, 265 Wis. 2d 853, 667 N.W.2d 364.

<u>Id.</u>, ¶15.

¶78 The first of the two propositions cited by the court of appeals——the idea that the court of appeals need not follow a case that conflicts with an earlier case of that court——has been stated elsewhere in Wisconsin law. <u>See, e.g.</u>, <u>State v. Swiams</u>, 2004 WI App 217, ¶23, 277 Wis. 2d 400, 690 N.W.2d 452 (citing <u>Bolden</u> for the proposition that "if two court of appeals decisions conflict, the first governs"); <u>Steiner v. Steiner</u>,

47

2004 WI App 169, ¶23 n.2, 276 Wis. 2d 290, 687 N.W.2d 740 (Dykman, J., dissenting) (explaining that <u>Bolden</u> holds that "if a conflict exists between two published court of appeals cases, the first in time governs"); <u>Leo's Salons, Inc. v. Deonne's Salon and Day Spa, LLC</u>, No. 2006AP1563, unpublished slip op., ¶13 & n.5 (Wis. Ct. App. 2007) (citing <u>Bolden</u> for the proposition that the "first of two published conflicting court of appeals opinions controls").

¶79 We need not express an opinion on the merits of the theory that, because "the court of appeals may not overrule, modify or withdraw language from a previously published decision of the court of appeals," <u>Cook v. Cook</u>, 208 Wis. 2d 166, 190, 560 N.W.2d 246, 256 (1997), any court of appeals decision which does so, whether explicitly or not, is essentially voidable by the court of appeals in that respect.  This is so because, even if logically valid, <u>application</u> of that principle by the court of appeals is problematic.[34]  Whether a later case misinterpreted

---

[34] Determining the theoretical validity of this principle would likely require interpretation of Article VII of the Wisconsin Constitution ("Judiciary") and Wis. Stat. § 752.41 ("Decisions"). <u>See, e.g.</u>, <u>Cook v. Cook</u>, 208 Wis. 2d 166, 185-86, 560 N.W.2d 246. Neither of these sources receive attention in the parties' briefing. Indeed, Houston Casualty did not address the issue at all, instead contending that it was moot. "Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 735 (2011) (citations omitted). Given that this issue was not fully briefed, it would be dangerous to address an issue as weighty as the constitutional authority of the court of appeals. Therefore, we decline to do so.

or "modif[ied]" an earlier case is not always apparent, and judges might disagree on that question. Additionally, a determination that a case impermissibly modified an earlier case and is thus not binding is effectively the same as overruling that case.

> It is our goal that the court of appeals speak with a unified voice . . . and it generally achieves that goal exceedingly well. However, when a perceived conflict arises, which is understandable given the huge volume of cases the court of appeals so capably handles, a certification to this court that points out the perceived conflict will best serve the public interest and will also aid this court in its law developing and clarifying function. However, overruling an earlier court of appeals decision is not an option.

State v. Johnson, 2004 WI 94, ¶18, 273 Wis. 2d 626, 681 N.W.2d 901 (citations omitted).

¶80 The court of appeals below was faced with a complex situation. However, we clarify that the court of appeals should have certified this case rather than resolved for itself whether Grube, Kenefick, and Radke misinterpreted Professional Office Buildings, and we instruct it to certify cases presenting similar types of conflicts in the future. Because we overrule portions of Grube, Kenefick, and Radke ourselves today, there is no reason to reverse the decision of the court of appeals.

## IV. CONCLUSION

¶81 We conclude that the complaints and counterclaim against Marks do not allege facts which, if proven, would constitute claims covered under the insurance policy Marks obtained from Houston Casualty. Houston Casualty therefore did

49

not breach its duty to defend Marks when it declined to defend him in the six lawsuits at issue.  Consequently, we affirm the decision of the court of appeals.

*By the Court.*— The decision of the court of appeals is affirmed.

¶82 ANN WALSH BRADLEY, J. *(concurring).* I agree with the majority's conclusion that the four-corners rule includes consideration of exclusions as well as exceptions to those exclusions in an insurance policy. Majority op., ¶40.

¶83 Additionally, I agree with its determination that "the complaints and counterclaim against Marks do not allege facts which, if proven, would constitute claims covered under the insurance policy Marks obtained from Houston Casualty." Majority op., ¶3.

¶84 I write separately, however, because I disagree with the majority's determination that "only two documents are germane in any four-corners analysis: the insurance policy and the complaint against the insured. No examination of extrinsic facts or evidence takes place." Majority op., ¶39 (citing Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶19, 261 Wis. 2d 4, 660 N.W.2d 666); see also majority op., ¶53 n. 25 ("[t]he duty to defend is based solely on the allegations contained within the four corners of the complaint, without resort to extrinsic facts or evidence . . . ") (citing Fireman's

*Fund*, 261 Wis. 2d 4, ¶19) (emphasis in original) (internal quotations omitted).[1]

¶85 The issue of whether the four-corners rule allows for an exception to consider the known facts extrinsic to the complaint is not before the court in this case. Instead, it is presented in Water Well Sols. Serv. Grp. Inc. v. Consol. Ins. Co., 2016 WI 54, ___ Wis. 2d ___, ___ N.W.2d ___, which is being released concurrently with this decision today.

¶86 My dissenting opinion in Water Well sets forth the analysis in support of my conclusion that when the complaint is factually incomplete or ambiguous, Wisconsin should adopt a narrow known fact exception to the four-corners rule. Consequently, I will not repeat the entirety of my dissent, but instead incorporate that conclusion and its analysis here.

¶87 Accordingly, I respectfully concur.

¶88 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

---

[1] The majority opinion is internally inconsistent because on one hand it says the duty to defend decision is based solely on the four-corners of the complaint while on the other hand it encourages insurers to investigate in order to inform its decision, acknowledging that "the applicability of an exclusion is rarely obvious from the allegations in the complaint." Majority op., ¶41 (citing Peter F. Mullaney, Liability Insurers' Duty to Defend, Wis. Law., at 10-11 (July 1995). See also Water Well Sols. Serv. Grp. Inc. v. Consol. Ins. Co., 2016 WI 54, ¶58-59, ___ Wis. 2d ___, ___ N.W.2d ___ (Ann Walsh Bradley, J., dissenting).

¶89 REBECCA G. BRADLEY, J. *(concurring).* I join the majority in affirming the court of appeals. I write separately, however, to address two important issues. First, although the majority reaffirms Cook v. Cook, 208 Wis. 2d 166, 560 N.W.2d 246 (1997), and holds the court of appeals should certify an appeal when its disposition depends upon conflicting published court of appeals cases, the majority does not explicitly overrule State v. Swiams, 2004 WI App 217, 277 Wis. 2d 400, 690 N.W.2d 452, or State v. Bolden, 2003 WI App 155, 265 Wis. 2d 853, 667 N.W.2d 364. This, in my opinion, may leave the courts and the bar with uncertainty. I write to clarify that the principle implied in Bolden and repeated as dicta in Swiams that "if two court of appeals decisions conflict, the first governs" directly conflicts with Cook and therefore is implicitly overruled by the majority opinion. Second, I would clarify or withdraw problematic language from Grube v. Daun, 173 Wis. 2d 30, 496 N.W.2d 106 (Ct. App. 1992), rather than overrule it.

## I. COOK V. COOK

¶90 In Bolden, the court of appeals' disposition depended upon two cases, State v. Jackson, 187 Wis. 2d 431, 523 N.W.2d 126 (Ct. App. 1994), and State v. Kuehl, 199 Wis. 2d 143, 545 N.W.2d 840 (Ct. App. 1995). The district II court of appeals decided Kuehl one year after district I decided Jackson. District II in Kuehl disagreed with district I's Jackson opinion, held that Jackson had been wrongly decided, and overruled it. See Kuehl, 199 Wis. 2d at 149. Although district

1

II acknowledged it was obligated to abide by Jackson, district II explained that it believed Jackson conflicted with an earlier case, State v. Haseltine, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984); therefore, district II concluded it was "free to follow the decision which we conclude is correct." Kuehl, 199 Wis. 2d at 149. Kuehl, which was decided before this court's pronouncement in Cook, was not appealed. Cook made clear that when the court of appeals believes a previously published court of appeals case was wrongly decided, the court of appeals does not have the power to overrule itself. Cook, 208 Wis. 2d at 189-90. If the court of appeals finds itself in a situation where it wants to overrule an earlier decision, it has two choices: (1) certify the appeal to this court; or (2) "decide the appeal, adhering to a prior case but stating its belief that the prior case was wrongly decided." Cook, 208 Wis. 2d at 190. Cook did not, however, explicitly overrule Kuehl. As a result, parties continued to ask the court of appeals to overrule its published decisions, relying on Kuehl's mistaken proposition. See Bolden, 265 Wis. 2d 853, ¶9.

¶91 Bolden, relying on Cook's statement prohibiting the court of appeals from overruling itself, reasoned that district II in Kuehl did not have the power to overrule district I's Jackson decision, and therefore relied on Jackson to affirm Bolden's conviction. Bolden, 265 Wis. 2d 853, ¶11. One year after Bolden, this court specifically addressed Kuehl and Jackson and reiterated the Cook rule that the court of appeals cannot overrule an earlier court of appeals decision. State v.

Johnson, 2004 WI 94, ¶¶16-18, 273 Wis. 2d 626, 681 N.W.2d 901. Johnson overruled the language in Kuehl suggesting that disregarding a published court of appeals opinion is a valid option. Id., ¶17. Johnson reiterated that the court of appeals does not have the option of disregarding its published opinions. Despite Johnson's clear holding that the court of appeals cannot overrule itself, the court of appeals has, on a few occasions since Johnson, cited Bolden for the very proposition that was overruled in Johnson. The majority cites the court of appeals decisions that have done so, see majority op., ¶78, most notably Swiams.

¶92 Swiams ignored this court's holding in Johnson and cited Bolden for the erroneous proposition that the court of appeals may decline to follow a case that conflicts with an earlier case. See Swiams, 277 Wis. 2d 400, ¶23.[1] This court has repeatedly held that the court of appeals cannot overrule itself and therefore does not have the option to disregard one published decision so it can follow an earlier published decision. The majority says so again here, thereby implicitly overruling the language in Swiams and any decision supporting the proposition that "if two court of appeals decisions conflict, the first governs." I would expressly overrule such language.

---

[1] This language in State v. Swiams, 2004 WI App 217, 277 Wis. 2d 400, 690 N.W.2d 452, was dicta as it appears in the last paragraph of that opinion, almost as an aside, and was not necessary for disposition of the appeal. Id., ¶23.

3

¶93 The majority emphasizes that Cook and Johnson hold that the court of appeals does <u>not</u> have the power to overrule itself. The majority explains why it is so important that the court of appeals does not disregard one opinion and choose to follow an earlier opinion: (1) the court of appeals does not have the authority to do so; (2) choosing to follow an earlier case <u>is</u> overruling the more recent case; and (3) courts' interpretations of whether cases conflict can widely differ. Majority op., ¶79. Also, as noted in Cook, allowing the court of appeals to follow the first-decided case because it believes a later case conflicts would interfere with "predictability, certainty and finality relied upon by litigants" and encourage forum shopping in the four districts of the court of appeals. Cook, 208 Wis. 2d at 189. For these important reasons, the court of appeals must abide by Cook, Johnson, and now this opinion, and stop disregarding one court of appeals decision because it believes an earlier decision should be followed.

¶94 In this case, both the circuit court and the court of appeals decided that Grube, 173 Wis. 2d 30, and two other cases[2] were not good law, disregarded those opinions, and applied the law from an earlier court of appeals opinion, Professional Office Buildings, Inc. v. Royal Indemnity Co., 145 Wis. 2d 573, 427 N.W.2d 427 (Ct. App. 1988). That should not have happened.

---

[2] The other two cases were Kenefick v. Hitchcock, 187 Wis. 2d 218, 522 N.W.2d 261 (Ct. App. 1994), and Radke v. Fireman's Fund Insurance Co., 217 Wis. 2d 39, 577 N.W.2d 366 (Ct. App. 1998).

4

Such action creates dangerous precedent for our court system. The circuit court should have followed the case law and the court of appeals should have certified Marks to this court to resolve any perceived conflict. See Cook, 208 Wis. 2d at 190; Johnson, 273 Wis. 2d 626, ¶¶16-18.

## II. GRUBE

¶95 The majority overrules Grube, 173 Wis. 2d 30, Kenefick v. Hitchcock, 187 Wis. 2d 218, 522 N.W.2d 261 (Ct. App. 1994), and Radke v. Fireman's Fund Ins. Co., 217 Wis. 2d 39, 577 N.W.2d 218, 522 N.W.2d 366 (Ct. App. 1998) as "inconsistent with a long line of Wisconsin case law," and "unsound in principle." Majority op., ¶¶73, 75. The majority explicitly overrules any statements in these cases "that exclusions may not be considered in an analysis of whether an insurer has breached its duty to defend its insured" when the insurer unilaterally denies a defense without seeking a coverage determination in court. Id., ¶75.

¶96 I agree with the majority that Wisconsin duty-to-defend law requires comparing the complaint to the entire insurance policy, including exclusions. See Estate of Sustache v. Am. Family Mut. Ins. Co., 2008 WI 87, ¶20, ¶¶22-23, 311 Wis. 2d 548, 751 N.W.2d 845. Instead of overruling Grube and its line of cases, however, I would harmonize it with Professional Office Buildings.

¶97 In determining whether a duty to defend exists under a policy, the court compares the four corners of the complaint to the entire policy, including exclusions. Estate of Sustache,

5

311 Wis. 2d 548, ¶¶22-23. Typically, however, as the majority notes at ¶41, an examination of policy exclusions at the duty-to-defend stage will not operate to relieve an insurer of its duty to defend. This is because whether an exclusion applies to preclude coverage often depends on extrinsic evidence, which is not considered in the duty-to-defend analysis. See Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶19, 261 Wis. 2d 4, 660 N.W.2d 666.

¶98 This basic principle, together with a lack of consistency of language used in insurance cases, is what has created confusion in the Grube line of cases. Grube, Kenefick, and Radke are often cited to argue that a court, which is asked to rule on a duty-to-defend question, cannot consider exclusions if an insurer unilaterally denied a defense to its insured. Of course, this is not the law. A duty-to-defend analysis always requires a comparison of the complaint to the entire policy, regardless of whether the insurer unilaterally denied a defense or chose one of the preferred methods to determine if a duty to defend was triggered by a complaint. It is only when a court determines an insurer breached its duty to defend, after the court compares the complaint to the entire policy, that an insurer may no longer rely on exclusions to avoid its indemnity obligations under the policy. See Professional Office Bldgs., Inc., 145 Wis. 2d at 585-86.

¶99 In Grube, the circuit court determined the insurer breached its duty to defend after the court considered the entire policy, including exclusions. Grube, 173 Wis. 2d at 49,

6

Unlike this case, the policy exclusions in Grube, when compared to the language in the complaint, did not preclude coverage. It was the insurer's breach of its duty to defend, and not the decision to unilaterally decline to defend its insured, which later precluded the insurer in Grube from invoking coverage defenses. The concluding paragraph in Grube makes this clear: "[the insurer], by not contesting coverage in court and by breaching its duty to defend [the insured], is estopped from raising any challenges to coverage and must indemnify [the insured] up to the limits of his policy." What the majority interprets as a departure from Wisconsin insurance law was more likely the court of appeals abbreviating its analysis in a case where it agreed with the circuit court that an insurer breached its duty to defend.[3] When a court determines the insurer breached the duty to defend, the insurer cannot use its exclusions to avoid paying out on the policy. Professional Office Bldgs., Inc., 145 Wis. 2d at 585-86. It is for this reason that we repeatedly caution insurers to opt for one of the preferred methods of determining coverage, see majority, ¶41 & n.21, rather than unilaterally refusing to defend.

---

[3] The language in Grube v. Daun, 173 Wis. 2d 30, 74, 496 N.W.2d 106 (Ct. App. 1992), triggering the confusion about whether it is the breach of the duty to defend or the unilateral decision of the insurer not to defend is as follows: "We hold that under Professional Office Bldgs., [the insurer] is estopped from raising any challenges to coverage; it must both defend and indemnify [the insured] because [the insurer] denied coverage outright."

7

¶100 This case, and a companion insurance case heard the same day, Water Well Solutions Service Group Inc. v. Consolidated Insurance Co., 2016 WI 54, ___ Wis. 2d ___, ___ N.W.2d ___, presented the less typical scenario where exclusions demonstrated the insurer did not have a duty to defend. In this case, we hold that a comparison of the complaint to the business enterprise exclusion confirms the insurer did not have a duty to defend. Majority op., ¶¶47-55. In Water Well we hold that a comparison of the complaint to the "your product" exclusion confirms the insurer did not have a duty to defend. Water Well Sols. Serv. Grp., ___ Wis. 2d ___, ¶3.

¶101 For these reasons, I respectfully concur.

8